# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

# FLORENCE DIVISION

**Bennett v. Williamsburg County, et al. Civil Action No. 4:26-cv-01034-JD-PJG**

## SUPPLEMENTAL EXHIBIT INDEX TO SECOND AMENDED COMPLAINT

### Count-by-Count Organization

*(Filed concurrently with Updated Exhibit Index of May 14, 2026)*

This Supplemental Exhibit Index identifies the supplemental sub-exhibits obtained or finalized after the May 9, 2026 Exhibit Index was filed, organized by the count(s) of the Second Amended Complaint each supports. This Index is a count-by-count companion to the Updated Exhibit Index of May 14, 2026 (which is organized alphabetically by parent exhibit letter A through BBB). All entries below appear as sub-exhibits appended to existing parent letters; no new exhibit letters are introduced.

The substantive Second Amended Complaint is not modified by this filing.

---

# COUNT STRUCTURE (per the Controlling Second Amended Complaint)

- **Count I** — First Amendment Retaliation, 42 U.S.C. § 1983
- **Count II** — First Amendment Viewpoint Discrimination & Unconstitutional Forum Restriction, 42 U.S.C. § 1983
- **Count III** — Equal Protection — Class of One & Racial Disparate Impact, 42 U.S.C. § 1983
- **Count IV** — Fourteenth Amendment Due Process, 42 U.S.C. § 1983
- **Count V** — Writ of Mandamus, 28 U.S.C. § 1361
- **Count VI** — South Carolina Freedom of Information Act, S.C. Code Ann. § 30-4-10 et seq.
- **Count VII** — Civil Conspiracy
- **Count VIII** — Unlawful Show of Authority, Fourth Amendment, 42 U.S.C. § 1983

# COUNT I — FIRST AMENDMENT RETALIATION (42 U.S.C. § 1983)

*Supplemental sub-exhibits supporting this count: 17*

| Sub-Ex | Description | Cluster |
|---|---|---|
| A-09 | Hixon Copp denial response (March 13, 2026) — "Economic development has not been involved in, nor is aware of any, lawsuit pertaining to INGKA Investments vs. Williamsburg County" | Parallel-denial pattern |
| A-11 | HR Dive: Ikea $566K spoliation sanction (FRE 404(b)(2)) | MO surveillance/evidence destruction |
| A-12 | AP News: Ikea $1.3M Versailles spying conviction (FRE 404(b)(2)) | MO surveillance/evidence destruction |
| H-04 | Sept 10, 2025 EDA $50M Partnership email — Sherman cc'd | EDA $50M grant package |
| H-05 | Sept 10, 2025 Resolution Establishing Federal Grant Partnership | EDA $50M grant package |
| H-06 | Nov 6-11, 2025 follow-up email chain — Washington slow response | EDA $50M grant package |
| L-10 | WCDC SoS record showing Hixon Copp as registered agent | Copp dual-role retaliation pathway |
| M-03 | Aug 11, 2025 Council agenda — Bennett appearance, Floyd VC presiding | Bennett protected activity |
| P-05 | Full April 3, 2026 Carter email thread ("does not yet exist" re JustUs CPP) | Carter retaliation/discriminatory denial |
| P-06 | JustUs CPP IRS 501(c)(3) Determination Letter (Dec 23, 2022 effective) | Rebuts Carter denial |
| P-07 | LISC Broadband Help Hub Technical Assistance Award (Oct 28, 2025) | Rebuts Carter denial |
| P-08 | USDA Project A2026MCADSC (May 13, 2026) | Rebuts Carter denial |
| P-09 | NPS Youth Programs FY26 Funding Selection (May 5, 2026) | Rebuts Carter denial |
| P-10 | SC SoS Public Charity Registration (March 1, 2024) | Rebuts Carter denial |
| Z-00 | Structural Conflict 5-Map Declaration (May 6, 2026) | Surveillance / retaliation network |
| Z-04 | IONOS Notepad capture (Oct 22, 2025, 2:35 PM) — | Pre-suit surveillance / Ikea MO |

| Sub-Ex | Description | Cluster |
|--------|-------------|---------|
| Z-05 | TRANSCRIPT iONOS Notepad capture (Oct 22, 2025, 6:39 PM) — TRANSCRIPT | Live audio interception / attempted spoliation / Ikea MO |

# COUNT II — FIRST AMENDMENT VIEWPOINT DISCRIMINATION & FORUM RESTRICTION (42 U.S.C. § 1983)

*Supplemental sub-exhibits supporting this count: 11*

| Sub-Ex | Description | Cluster |
|--------|-------------|---------|
| A-03 | June 17, 2025 Council Agenda — Project TenAcres SSRC + MCIP; Floyd VC | Pattern of SSRC adoption favoring commercial actors |
| A-04 | July 7, 2025 Council Agenda — ADOPTION Project TenAcres | Pattern of SSRC adoption favoring commercial actors |
| A-05 | Dec 16, 2025 Ord 2025-10 — Ten Governors Solar SSRC FILOT | Pattern of SSRC adoption favoring commercial actors |
| A-06 | Project Ingka Solar Composite | Pattern of SSRC adoption favoring commercial actors |
| L-04 | Sam L. Floyd dual-role admission (Blackburn email, Mar 30, 2026) | Floyd enabling viewpoint discrimination |
| L-05 | Aug 19, 2025 Council Agenda — Floyd voting on Santee Electric FILOT | Floyd enabling viewpoint discrimination |
| L-07 | WCDC adoption by Billy Jenkinson | Floyd / Jenkinson dual-role |
| L-08 | WCDC SoS Gilleon Frieson registered agent | WCDC pre-execution SSRC communications |
| L-09 | WCDC address change to WCEDB | Interlocking governance enabling discrimination |
| L-11 | SoS multi-change registered agent profile | Pattern of WCDC governance shifts |
| M-03 | Aug 11, 2025 Council agenda — Bennett appearance | Bennett viewpoint expression suppressed |

# COUNT III — EQUAL PROTECTION — CLASS OF ONE & RACIAL DISPARATE IMPACT (42 U.S.C. § 1983)

*Supplemental sub-exhibits supporting this count: 22*

| Sub-Ex | Description | Cluster |
|---|---|---|
| A-03 | June 17, 2025 SSRC + MCIP commercial adoption | Commercial vs. nonprofit comparator |
| A-04 | July 7, 2025 ADOPTION Project TenAcres | Commercial vs. nonprofit comparator |
| A-05 | Dec 16, 2025 Ten Governors Solar SSRC FILOT | Commercial vs. nonprofit comparator |
| A-08 | SR Georgetown LLC — Georgetown County FILOT Comparator | Class-of-one comparator (proper disclosure vs. blank parcel) |
| H-04 | Sept 10, 2025 EDA $50M Partnership email | EDA non-action vs. commercial action |
| H-05 | Sept 10, 2025 Partnership Resolution | EDA non-action vs. commercial action |
| H-06 | Nov 6-11, 2025 follow-up email chain | EDA non-action vs. commercial action |
| L-04 | Floyd dual-role admission | Interlocking governance enabling disparate treatment |
| L-05 | Aug 19, 2025 Floyd voting on Santee Electric FILOT | Interlocking governance |
| L-06 | WCDC 1995 SoS filing –– Frank Hilton McGill | Interlocking governance (state actor) |
| L-07 | WCDC adoption by Billy Jenkinson | Interlocking governance |
| L-09 | WCDC address change to WCEDB | Interlocking governance |
| L-10 | WCDC SoS Hixon Copp registered agent | Copp dual-role |
| L-11 | SoS multi-change registered agent profile | Interlocking governance |
| N-03 | Kingstree East Project Review Package Part 1 (May 13, 2026) | Disparate environmental review |
| P-05 | Full April 3, 2026 Carter email thread | Discriminatory denial of CPP |
| P-06 | JustUs CPP IRS 501(c)(3) Determination Letter | Federal recognition of CPP comparator |
| P-07 | LISC Broadband Help Hub Award | Federal recognition of CPP comparator |
| P-08 | USDA Project A2026MCADSC | Federal recognition of CPP comparator |
| P-09 | NPS Youth Programs FY26 Funding | Federal recognition of CPP comparator |
| P-10 | SC SoS Public Charity Registration | Federal/state recognition of CPP comparator |

| Sub-Ex | Description | Cluster |
|---|---|---|
| T-04 | 1819 News — Silicon Ranch Stockton litigation | Solar developer comparator background |

# COUNT IV — FOURTEENTH AMENDMENT DUE PROCESS (42 U.S.C. § 1983)

*Supplemental sub-exhibits supporting this count: 13*

| Sub-Ex | Description | Cluster |
|---|---|---|
| A-03 | June 17, 2025 Council Agenda — Project TenAcres | SSRC adoption without disclosed public process |
| A-04 | July 7, 2025 Council ADOPTION | SSRC adoption without disclosed public process |
| A-05 | Dec 16, 2025 Ord 2025-10 — Ten Governors Solar SSRC | SSRC adoption without disclosed public process |
| A-06 | Project Ingka Solar Composite | SSRC adoption without disclosed parcels |
| A-07 | Plaintiff March 3, 2026 FOIA inspection request re: Ingka IRI lawsuit | Undisclosed Ingka-related litigation |
| A-08 | SR Georgetown LLC FILOT Comparator | Process afforded to comparator |
| A-09 | Hixon Copp denial response re Ingka lawsuit | Undisclosed Ingka-related litigation |
| A-10 | Sunbelt Rentals mechanics lien v. Kingstree West/Ingka | Proof of actually-existing Ingka litigation |
| H-05 | Sept 10, 2025 Partnership Resolution never agendized | EDA Partnership submitted but never agendized |
| L-08 | WCDC SoS Gilleon Frieson registered agent | WCDC state-actor analysis |
| L-10 | WCDC SoS Hixon Copp registered agent | WCDC state-actor analysis |
| N-03 | Kingstree East Project Review Package Part 1 | No mandatory environmental review |
| T-04 | 1819 News — Silicon Ranch Stockton litigation | Background re solar developer process |

# COUNT V — WRIT OF MANDAMUS (28 U.S.C. § 1361)

*Supplemental sub-exhibits supporting this count: 2*

| Sub-Ex | Description | Cluster |
|---|---|---|
| A-07 | Plaintiff March 3, 2026 FOIA inspection request | Lawful request triggering clear public duty |
| A-09 | Hixon Copp denial response | Refusal to perform clear public duty |

## COUNT VI — SOUTH CAROLINA FREEDOM OF INFORMATION ACT (S.C. Code Ann. § 30-4-10 et seq.)

*Supplemental sub-exhibits supporting this count: 2*

| Sub-Ex | Description | Cluster |
|---|---|---|
| A-07 | Plaintiff March 3, 2026 FOIA inspection request | Lawful FOIA request |
| A-09 | Hixon Copp denial response | Public-body denial / FOIA obstruction |

## COUNT VII — CIVIL CONSPIRACY

*Supplemental sub-exhibits supporting this count: 31*

| Sub-Ex | Description | Cluster |
|---|---|---|
| A-03 | June 17, 2025 Council Agenda — Project TenAcres | SSRC adoption pattern by network |
| A-04 | July 7, 2025 Council ADOPTION | SSRC adoption pattern by network |
| A-05 | Dec 16, 2025 Ord 2025-10 — Ten Governors Solar | SSRC adoption pattern by network |
| A-06 | Project Ingka Solar Composite | SSRC adoption pattern by network |
| A-07 | Plaintiff March 3, 2026 FOIA inspection request | Predicate to concealment evidence |
| A-08 | SR Georgetown LLC FILOT Comparator | Comparator showing County's selective process |
| A-09 | Hixon Copp denial response | Concealment of Ingka litigation (parallel- |

| Sub-Ex | Description | Cluster |
|---|---|---|
| | | denial pattern) |
| A-10 | Sunbelt Rentals mechanics lien | Proof of concealed Ingka litigation |
| A-11 | HR Dive: Ikea $566K spoliation sanction | MO pattern (FRE 404(b)(2)) |
| A-12 | AP News: Ikea $1.3M Versailles spying conviction | MO pattern (FRE 404(b)(2)) |
| H-04 | Sept 10, 2025 EDA Partnership email | EDA non-action by network |
| H-06 | Nov 6-11, 2025 follow-up email chain | EDA non-action by network |
| L-04 | Sam L. Floyd dual-role admission | Floyd dual-role / interlocking governance |
| L-05 | Aug 19, 2025 Floyd voting on Santee Electric FILOT | Floyd dual-role / interlocking governance |
| L-06 | WCDC 1995 SoS — Frank Hilton McGill | State-actor history (Brentwood) |
| L-07 | WCDC adoption by Billy Jenkinson | Jenkinson dual-role |
| L-08 | WCDC SoS Gilleon Frieson registered agent | WCDC pre-execution SSRC communications |
| L-09 | WCDC address change to WCEDB | Interlocking governance |
| L-10 | WCDC SoS Hixon Copp registered agent | Copp dual-role |
| L-11 | SoS multi-change registered agent profile | Pattern of WCDC governance shifts |
| P-02 | WCDH SoS naming Carter principal | Carter / WCDH structural conflict |
| P-03 | SC SoS WCDH entity profile | Carter / WCDH structural conflict |
| P-05 | Full April 3, 2026 Carter email thread | Carter retaliation/discriminatory denial |
| P-06 | JustUs CPP IRS 501(c)(3) Determination Letter | Rebuts Carter denial (concert-of-action evidence) |
| P-07 | LISC Broadband Help Hub Award | Rebuts Carter denial |
| P-08 | USDA Project A2026MCADSC | Rebuts Carter denial |
| P-09 | NPS Youth Programs FY26 Funding | Rebuts Carter denial |
| P-10 | SC SoS Public Charity Registration | Rebuts Carter denial |
| Z-00 | Structural Conflict 5-Map Declaration | Overt act / network mapping |
| Z-04 | IONOS Notepad capture (Oct 22, 2025, 2:35 PM) | Overt act by unidentified agent –– Ikea MO |
| Z-05 | IONOS Notepad capture (Oct 22, 2025, 6:39 PM) | Overt act by unidentified agent — Ikea MO |

# COUNT VIII — UNLAWFUL SHOW OF AUTHORITY (FOURTH AMENDMENT, 42 U.S.C. § 1983)

*Supplemental sub-exhibits supporting this count: 0*

The September 8, 2025 events forming the basis of Count VIII remain supported by parent exhibits **BB, BB-1, BB-2, BB-3** filed with the May 9, 2026 Exhibit Index. No new sub-exhibits supporting Count VIII are introduced in this supplemental filing.

# TOTAL SUPPLEMENTAL SUB-EXHIBITS

**35 unique supplemental sub-exhibits** distributed across the counts as follows (with some sub-exhibits supporting multiple counts):

- Count I: 17
- Count II: 11
- Count III: 22
- Count IV: 13
- Count V: 2
- Count VI: 2
- Count VII: 31
- Count VIII: 0

# AUTHENTICATION (applies to all supplemental sub-exhibits)

1. **Plaintiff's Verification under 28 U.S.C. § 1746** attached to the Second Amended Complaint covers Plaintiff's personal knowledge of the matters memorialized in supplemental sub-exhibits authored by Plaintiff (Ex. A-07, the Ex. Z cluster, and others).
2. **Self-authenticating public records** under Fed. R. Evid. 902(4):
   - Federal IRS records (Ex. P-06)
   - SC Secretary of State records (Exs. L-06 through L-11, P-02, P-03, P-10)
   - Federal agency records (Exs. P-07, P-08, P-09)
3. **Party admissions under Fed. R. Evid. 801(d)(2):**
   - Ex. A-09 (Hixon Copp denial of Ingka lawsuit)
   - Ex. P-05 (Ronald D. Carter, Jr. "does not yet exist" statement)
   - Ex. L-04 (Megan Blackburn / Santee Electric)

- o   Ex. H-04, H-06 (Defendant Washington / County Clerk Epps-McClary)
4. **FRE 404(b)(2) limited-purpose** non-character evidence offered for pattern, plan, intent, identity, or notice — not for the truth of the matter asserted:
    - o   Ex. A-11 (HR Dive — Ikea spoliation sanction)
    - o   Ex. A-12 (AP News — Ikea Versailles spying conviction)
    - o   Ex. T-04 (1819 News — Silicon Ranch litigation)
5. **Fed. R. Evid. 901(b)(1) personal-knowledge authentication** by Plaintiff for:
    - o   Ex. AA (Plaintiff's contemporaneous written record of January 20, 2026 conversation with Defendant Copp) — supported by Ex. AA-1 (declaration re events) and Ex. AA-2 (authentication declaration)
    - o   Ex. Z-04 and Z-05 (Plaintiff's contemporaneous screenshot captures of IONOS Notepad October 22, 2025) — to be supported by accompanying § 1746 declaration

Respectfully submitted,

**Dr. Lathonia Bennett, DDS** *Pro Se* Plaintiff 137 Broughton Avenue, Andrews, SC 29510 P.O. Box 1010, Kingstree, SC 29556 lathonia@justuscpp.org

Dated: 15th May, 2026

# CERTIFICATE OF SERVICE

I hereby certify that on the date set forth below, a true and correct copy of the foregoing **Supplemental Exhibit Index to Second Amended Complaint (Count-by-Count Organization)** was served upon counsel for Defendants via the Court's CM/ECF system:

- **Daniel C. Plyler** and **William K. Rees** Smith Robinson Holler DuBose & Morgan, LLC 3200 Devine Street, Columbia, SC 29205
- **Steve A. Matthews** Haynsworth Sinkler Boyd, P.A. 1201 Main Street, 22nd Floor, Columbia, SC 29201

**Dr. Lathonia Bennett, DDS** *Pro Se* Plaintiff

Dated: 15th May, 2026

# County of Williamsburg





**Council Members**
Joseph Lee
Torrance T. Wilson
Randall Nesmith
Glenn A. Keels

**Council Members**
Paul E. McKnight
Samuel L. Floyd, Vice Chair
Jacquelyn B. Hailes
Tammi Epps-McClary, Clerk

Kelvin C. Washington
County Supervisor/Chairman
www.williamsburgcounty.sc.gov

## PUBLIC HEARING AND REGULAR COUNTY COUNCIL MEETING
PUBLIC SERVICE ADMINISTRATION BUILDING – 1ST FLOOR - COUNCIL CHAMBERS
201 W. MAIN STREET, KINGSTREE, SC 29556
**Tuesday, June 17, 2025 @ 5:45 P.M.**

## AGENDA

### NOTICE OF MEETING

Pursuant To The Freedom Of Information Act, Notice Of The Meeting, Date, Time, Place Of Meeting And Agenda Is Posted On The Doors And Bulletin Board At The Public Service Administration Building, 201 W Main St., Kingstree SC, And The Williamsburg County Website -- [www.Williamsburgcounty.sc.gov]. In Addition, The Agenda Was Electronically Sent To Newspapers, County Council, County Attorney. The Chambers Are Open To The Public For The Williamsburg County Council Meetings. Public Access Will Be Provided By Live Video Stream And Can Be Viewed At The Williamsburg County Website At www.williamsburgcounty.sc.gov And www.facebook.com/williamsburgcountygovernment. Citizen Comments Must Be By Written Request And Limited To Three (3) Minutes Two Weeks Prior To Council Meeting Date.

**The Public Hearing Will Begin at 5:45 pm**

### PUBLIC HEARING(S)

**Ordinance Number 2025-03** - An Ordinance To Provide For The Levy Of Taxes In Williamsburg County For The Fiscal Year Beginning July 1, 2025 And Ending June 30, 2026; To Provide For The Appropriation Thereof; To Provide For Revenues For The Payment Thereof; To Provide For The Expenditure Of Tax Revenues And Other County Funds; And To Provide For Other Matters Related Thereto.

| Revenues | Budget FY 2024-2025 | Budget FY 2025-2026 | Percent Change |
|---|---|---|---|
| General Fund | 26,414,234.00 | 26,770,848.00 | 1.35% |
| Debt Service | 4,342,590.00 | 2,973,035.00 | -31.53% |
| Rural Fire Operations | 1,148,085.00 | 1,275,748.00 | 11.12% |

| Expenditures | Budget FY 2024-2025 | Budget FY 2025-2026 | Percent Change |
|---|---|---|---|
| General Fund | 26,414,234.00 | 26,770,848.00 | 1.35% |
| Debt Service | 4,342,590.00 | 2,973,035.00 | -31.53% |
| Rural Fire Operations | 1,148,085.00 | 1,275,748.00 | 11.12% |

| Millage | Budget FY 2024-2025 | Budget FY 2025-2026 |
|---|---|---|
| General Fund | 136.80 | 136.80 |
| Debt Service | 29.70 | 29.70 |
| Rural Fire Operations | 15.40 | 15.40 |
| Rural Fire Debt Service | 7.9 | 7.9 |
| Williamsburg Tech. | 11.0 | 11.00 |

**The Regular Council Meeting Will Begin Immediately After The Public Hearing**

**CALL TO ORDER**
**INVOCATION**
**MINUTES**
1. Public Hearing And Regular Council Meeting Monday, June 2, 2025
**ORDINANCE(S)**
1. **1st Reading** – There Are No Ordinances For First Reading.
2. **2nd Reading Of Ordinance No. 2025-04** – An Ordinance Authorizing The Execution And Delivery Of An Infrastructure Credit Agreement By And Between Williamsburg County, South Carolina And A Company Currently Identified As Project Ten Acres, Providing For The Issuance Of Special Source Revenue Credits And Addressing Other Matters Related Thereto.
3. **2nd Reading Of Ordinance No. 2025-05** – An Ordinance Authorizing The Enlargement Of The Joint County Industrial Park Between Williamsburg County, South Carolina And Florence County, South Carolina To Include Property Located In Williamsburg County; And Other Matters Related Thereto.
4. **3rd Reading And Adoption Of Ordinance No. 2025-03 -** An Ordinance To Provide For The Levy Of Taxes In Williamsburg County For The Fiscal Year Beginning July 1, 2025 And Ending June 30, 2026; To Provide For The Appropriation Thereof; To Provide For Revenues For The Payment Thereof; To Provide For The Expenditure Of Tax Revenues And Other County Funds; And To Provide For Other Matters Related Thereto.
**RESOLUTION**
1. **Resolution No. 2025-05** – A Resolution Honoring Kiera Nicole Joe By Williamsburg County Government. WHEREAS Kiera Nicole Joe, Age 22, Of Salters, South Carolina, Was A Beloved And Dedicated Employee Of Williamsburg County Government, Serving With Commitment And Professionalism In The Treasurer's Office In Kingstree; And WHEREAS, During Her Tenure With The County, Kiera Exemplified Excellence In Public Service, Demonstrating Integrity, Diligence, And A Sincere Concern For The Citizens Of Williamsburg County; And WHEREAS, Her Warm Spirit, Positive Attitude, And Collegial Demeanor Left An Indelible Mark On All Who Had The Pleasure Of Working With Her; And WHEREAS, The Untimely Passing Of Kiera Nicole Joe Is A Profound Loss To Her Family, Friends, Colleagues, And The Greater Williamsburg County Community; And WHEREAS, It Is Fitting And Proper That Williamsburg County Recognize And Honor Her Life, Service, And The Lasting Impact She Made In Her Role As A Public Servant That This Resolution Be Recorded In The Official Minutes Of Williamsburg County And That A Copy Be Presented To Her Family As A Token Of The County's Deepest Sympathy And Gratitude.
**COUNTY COUNCIL REPORT**
**COUNTY SUPERVISOR'S REPORT**
**ADJOURNMENT**

Persons with disabilities who may require special accommodations should contact the Receptionist at (843) 355-9321 Ext. 5102 or 5401
**P.O. 330 * 201 West Main Street * South Carolina 29556 * Telephone (843) 355-9321**

# County of Williamsburg

Council Members
Joseph Lee
Torrance T. Wilson
Randall Nesmith
Glenn A. Keels



Council Members
Paul E. McKnight
Samuel L. Floyd, Vice Chair
Jacquelyn B. Hailes
Tammi Epps-McClary, Clerk

Kelvin C. Washington
County Supervisor/Chairman
www.williamsburgcounty.sc.gov



## PUBLIC HEARING AND REGULAR COUNTY COUNCIL MEETING
PUBLIC SERVICE ADMINISTRATION BUILDING – 1ST FLOOR - COUNCIL CHAMBERS
201 W. MAIN STREET, KINGSTREE, SC 29556
**Monday, July 7, 2025 @ 5:45 P.M.**

## AGENDA

### NOTICE OF MEETING
Pursuant To The Freedom Of Information Act, Notice Of The Meeting, Date, Time, Place Of Meeting And Agenda Is Posted On The Doors And Bulletin Board At The Public Service Administration Building, 201 W Main St., Kingstree SC, And The Williamsburg County Website – [www.Williamsburgcounty.sc.gov]. In Addition, The Agenda Was Electronically Sent To Newspapers, County Council, County Attorney. The Chambers Are Open To The Public For The Williamsburg County Council Meetings. Public Access Will Be Provided By Live Video Stream And Can Be Viewed At The Williamsburg County Website At www.williamsburgcounty.sc.gov And www.facebook.com/williamsburgcountygovernment. Citizen Comments Must Be By Written Request And Limited To Three (3) Minutes Two Weeks Prior To Council Meeting Date.

**The Public Hearing Will Begin at 5:45 pm**

### PUBLIC HEARING(S)

**Ordinance No. 2025-04** – An Ordinance Authorizing The Execution And Delivery Of An Infrastructure Credit Agreement By And Between Williamsburg County, South Carolina And A Company Currently Identified As Project Ten Acres, Providing For The Issuance Of Special Source Revenue Credits And Addressing Other Matters Related Thereto.

**Ordinance No. 2025-05** – An Ordinance Authorizing The Enlargement Of The Joint County Industrial Park Between Williamsburg County, South Carolina And Florence County, South Carolina To Include Property Located In Williamsburg County; And Other Matters Related Thereto.

**The Regular Council Meeting Will Begin Immediately After The Public Hearing**

### CALL TO ORDER
### INVOCATION
### MINUTES
1. Public Hearing And Regular Council Meeting Tuesday, June 17, 2025

### EXECUTION SESSION
1. According To Section 30-40-70 A(2) – Discussion Of A Personnel Matter Concerning The Williamsburg County Sheriff's Office.
2. According To Section 30-40-70 A(5) – Discussion Of A Contractual Matter Concerning The Williamsburg County Landfill.

### ORDINANCE(S)
1. **1st Reading Of Ordinance No. 2025-007** - To Impose, Subject To Referendum Approval And Pursuant To The Capital Project Sales Tax Act, A One Percent (1%) Sales And Use Tax (The "Tax") Within Williamsburg County For Not More Than Eight (8) Years; To Order A County-Wide Referendum On The Question Of Imposing The Tax And Authorizing The Issuance Of General Obligation Bonds (The "Bonds"); To Prescribe The Contents Of The Ballot Question; To Specify The Purposes For Which The Proceeds From The Tax Are To Be Used, The Maximum Time For The Imposition Of The Tax And Certain Provisions Relating To The Issuance Of The Bonds, If Approved By Referendum, By Subsequent Action Of County Council; And To Provide For Other Matters Relating Thereto.
2. **2nd Reading** - There Are No Ordinances for Second Reading.
3. **3rd Reading And Adoption Of Ordinance No. 2025-04** – An Ordinance Authorizing The Execution And Delivery Of An Infrastructure Credit Agreement By And Between Williamsburg County, South Carolina And A Company Currently Identified As Project Ten Acres, Providing For The Issuance Of Special Source Revenue Credits And Addressing Other Matters Related Thereto.
4. **3rd Reading And Adoption Of Ordinance No. 2025-05** – An Ordinance Authorizing The Enlargement Of The Joint County Industrial Park Between Williamsburg County, South Carolina And Florence County, South Carolina To Include Property Located In Williamsburg County; And Other Matters Related Thereto.

### RESOLUTION
1. **Resolution No. 2025-06** - A Resolution Providing For The Issuance And Sale Of A Tax Anticipation Note In An Amount Up To $3,250,000 By Williamsburg County, South Carolina, For The Fiscal Year Beginning July 1, 2025 And Ending June 30, 2026, Hereinafter Referred To As Fiscal Year 2025-2026.

### APPEARANCE(S)
1. Allen Nesmith, Pastor Of St. James United Methodist Church
2. Tyron Wilson, Founder & CEO Of Tyron Wilson Let Us Mentor (TWLUM) Team Project
3. Yolanda McCray, President & CEO Of Black River United Way And Mauretta Wilson, Town Administrator For The Town Of Andrews

### COUNTY COUNCIL REPORT
### COUNTY SUPERVISOR'S REPORT
### ADJOURNMENT

Persons with disabilities who may require special accommodations should contact the Receptionist at (843) 355-9321 Ext. 5102 or 5401
**P.O. 330 \* 201 West Main Street \* South Carolina 29556 \* Telephone (843) 355-9321**

A-05

# County of Williamsburg



Council Members
Joseph Lee
Torrance T. Wilson
Randall Nesmith
Glenn A. Keels

Council Members
Paul E. McKnight
Samuel L. Floyd, Vice Chair
Jacquelyn B. Hailes
Tammi Epps-McClary, Clerk

Kelvin C. Washington
County Supervisor/Chairman
www.williamsburgcounty.sc.gov

**PUBLIC HEARING AND REGULAR COUNTY COUNCIL MEETING**
**PUBLIC SERVICE ADMINISTRATION BUILDING – 1ST FLOOR - COUNCIL CHAMBERS**
**201 W. MAIN STREET, KINGSTREE, SC 29556**
**TUESDAY, DECEMBER 16, 2025 @ 5:45 P.M.**

## AGENDA

### NOTICE OF MEETING

Pursuant To The Freedom Of Information Act, Notice Of The Meeting, Date, Time, Place Of Meeting And Agenda Is Posted On The Doors And Bulletin Board At The Public Service Administration Building, 201 W Main St., Kingstree SC, And The Williamsburg County Website -- [www.Williamsburgcounty.sc.gov]. In Addition, The Agenda Was Electronically Sent To Newspapers, County Council, County Attorney. The Chambers Are Open To The Public For The Williamsburg County Council Meetings. Public Access Will Be Provided By Live Video Stream And Can Be Viewed At The Williamsburg County Website At www.williamsburgcounty.sc.gov And www.facebook.com/williamsburgcountygovernment. Citizen Comments Must Be By Written Request To The Clerk To Council Two Weeks Prior To Council Meeting Date And Limited To Three (3) Minutes To Speak.

**The Public Hearing(s) Will Begin 5:45 P.M.**

### PUBLIC HEARING(S)

1. **Ordinance Number 2025-09** - An Ordinance Authorizing The Enlargement Of The Joint County Industrial Park Between Florence County, South Carolina And Williamsburg County, South Carolina; And Other Matters Related Thereto.
2. **Ordinance Number 2025-10** -- An Ordinance Authorizing Pursuant To Title 12, Chapter 44 Of The Code Of Laws Of South Carolina 1976, As Amended, The Execution And Delivery Of A Fee In-Lieu Of Ad Valorem Tax Agreement By And Between Williamsburg County, South Carolina And Ten Governors Solar, LLC And Certain Affiliates To Provide For Fee-In-Lieu Of Ad Valorem Tax Incentives And Certain Special Source Revenue Credits; And Authorizing Other Related Matters.
3. **Sykes Building Renovation And Completion Project** –The Purpose Of This Notice Is To Give The Public An Opportunity To Become Acquainted With A Proposed Rural Development Project Consisting Generally Of The Renovation And Completion Of The Sykes Building To Serve As A Multi-Department County Government Facility.

**Regular County Council Meeting Will Begin 6:00 P.M. Or Immediately After The Public Hearing(s)**

### CALL TO ORDER
### INVOCATION
### MINUTES

1. Approval Of The Regular County Council Meeting Tuesday, November 18, 2025
2. Approval Of The Public Hearing And Regular County Council Meeting Monday, December 1, 2025

### ORDINANCE(S)

1. **1st Reading Of Ordinance Number – 2025-12** - An Ordinance Authorizing The Enlargement Of The Joint County Industrial Park Between Florence County, South Carolina And Williamsburg County, South Carolina To Include Project Splitshot; And Other Matters Related Thereto.
2. **1st Reading Of Ordinance Number 2025-13** - An Ordinance Accepting The Transfer Of Certain Authority To The Board Of Elections And Voter Registration Of Williamsburg County To Conduct Municipal Elections For The Town Of Greeleyville.
3. **2nd Reading** - There Are No Ordinances For Second Reading.
4. **3rd Reading And Adoption Of Ordinance Number 2025-09** - An Ordinance Authorizing The Enlargement Of The Joint County Industrial Park Between Florence County, South Carolina And Williamsburg County, South Carolina; And Other Matters Related Thereto.
5. **3rd Reading And Adoption Of Ordinance Number 2025-10** – An Ordinance Authorizing Pursuant To Title 12, Chapter 44 Of The Code Of Laws Of South Carolina 1976, As Amended, The Execution And Delivery Of A Fee In-Lieu Of Ad Valorem Tax Agreement By And Between Williamsburg County, South Carolina And Ten Governors Solar, LLC And Certain Affiliates To Provide For Fee-In-Lieu Of Ad Valorem Tax Incentives And Certain Special Source Revenue Credits; And Authorizing Other Related Matters.

### NEW BUSINESS

1. The Approval Of Two (2) Additional Days For The Christmas Holiday For County Employees.

### OLD BUSINESS

1. Contractual Agreement For Partnership Between Williamsburg County And Coastal Carolina YMCA (**Action Required**).
2. A Personnel Matter In Executive Session Concerning The Williamsburg County Sheriff's Office Discussed At The December 1st Finance Committee Meeting (**Action Required**).

### APPEARANCE(S)

3. Cheryl Lane, Comments Concerning Solar Updates In Williamsburg County.

### EXECUTIVE SESSION
### COUNTY COUNCIL REPORT
### COUNTY SUPERVISOR'S REPORT
### ADJOURNMENT

Persons with disabilities who may require special accommodations should contact the Receptionist at (843) 355-9321 Ext. 5102 or 5401

**P.O. 330 * 201 West Main Street * South Carolina 29556 * Telephone (843) 355-9321**

4:26-cv-01034-JD-PJG    Date Filed 05/19/26    Entry Number 93-4    Page 13 of 58

A 07

## Ingka Investment Forrest Assets, LLC_ IRI Lawsuit file inspection

From:  lathonia@justuscpp.org

To:    tammi.mcclary@wc.sc.gov; tammi.mcclary@wc.sc.gov

Bcc:   blackriverguardians@gmail.com

Date:  Tuesday, March 3, 2026 at 08:46 PM UTC

Dear Ms. McClary,

Pursuant to the South Carolina Freedom of Information Act, S.C. Code Ann. §30-4-10 et seq., I respectfully request an opportunity to inspect public records relating to the lawsuit involving Ingka IRI Forest, Inc. and Williamsburg County.

This request includes, but is not limited to, inspection of the following records:

The complaint, summons, pleadings, amended pleadings, motions, briefs, and supporting exhibits filed in the matter.

Any orders, rulings, judgments, settlement agreements, or dismissal documents.

Engagement letters, contracts, or agreements with outside counsel retained in connection with the litigation.

Invoices, billing statements, and records reflecting legal fees and expenses paid or incurred by Williamsburg County in connection with the litigation.

Correspondence (including emails and text messages) between Council members, the County Supervisor, the Clerk of Council, County staff, outside counsel, or representatives of Ingka IRI Forest, Inc. concerning the litigation.

Executive session notices, agendas, minutes, summaries, or recordings referencing discussion of the Ingka IRI litigation.

Any insurance notifications, coverage communications, or indemnification documents related to the lawsuit.

Any public statements, press releases, meeting announcements, or agenda references concerning the litigation.

Any internal memoranda, reports, analyses, or briefing materials prepared for Council regarding the litigation.

I am requesting inspection of these records at a mutually convenient time during regular business hours. If any portion of the requested records is claimed to be exempt from disclosure, please identify the specific statutory exemption relied upon and provide a written explanation as required by S.C. Code Ann. §30-4-30(c).

If the County maintains a written policy requiring use of a specific form for FOIA requests, please provide a copy of that policy and the authority under which it was adopted.

Please confirm within the timeframes required by law when the requested records will be made available for inspection.

Thank you for your attention to this matter.

Sincerely,

Lathonia Bennett


Lathonia Bennett, DDS
JustUs CPP
PO Box 1010
Kingstree, SC 29556
843 800-0087
912 996-3303
lathonia@justuscpp.orghttps://justuscpp.orgpaypal.com/us/fundraiser/charity/5603666

1 of 1                                                                                              5/8/2026, 11:02 AM

A +0 9

Response!!!!!RE: [External] Ingka Investment Forrest Assets, LLC_ IRI Lawsuit file inspection

From: McClary, Tammi (tammi.mcclary@wc.sc.gov)

To: lathonia@justuscpp.org

Cc: lathonia@yahoo.com

Date: Friday, March 13, 2026 at 01:29 PM UTC

Ms. Lathonia, the following email from Hixon Copp, is a response to your request concerning Ingka Investment Forrest Assets, LLC_ IRI Lawsuit file inspection.

From: Copp, Hixon <Hixon.Copp@wc.sc.gov>
Sent: Friday, March 13, 2026 9:19 AM
To: McClary, Tammi <Tammi.McClary@wc.sc.gov>
Cc: M Shuler <mshuler@attorneyssc.com>
Subject: Re: [External] Ingka Investment Forrest Assets, LLC_ IRI Lawsuit file inspection

Economic development has not been involved in, nor is aware of any, lawsuit pertaining to INGKA Investments vs. Williamsburg County.

-----Original Message-----
From: lathonia@justuscpp.org <lathonia@justuscpp.org>
Sent: Tuesday, March 3, 2026 3:47 PM
To: McClary, Tammi <tammi.mcclary@wc.sc.gov>; McClary, Tammi <tammi.mcclary@wc.sc.gov>
Subject: [External] Ingka Investment Forrest Assets, LLC_ IRI Lawsuit file inspection

Dear Ms. McClary,

Pursuant to the South Carolina Freedom of Information Act, S.C. Code Ann. §30-4-10 et seq., I respectfully request an opportunity to inspect public records relating to the lawsuit involving Ingka IRI Forest, inc. and Williamsburg County.

This request includes, but is not limited to, inspection of the following records:

The complaint, summons, pleadings, amended pleadings, motions, briefs, and supporting exhibits filed in the matter.

Any orders, rulings, judgments, settlement agreements, or dismissal documents.

Engagement letters, contracts, or agreements with outside counsel retained in connection with the litigation.

Invoices, billing statements, and records reflecting legal fees and expenses paid or incurred by Williamsburg County in connection with the litigation.

Correspondence (including emails and text messages) between Council members, the County Supervisor, the Clerk of Council, County staff, outside counsel, or representatives of Ingka IRI Forest, Inc. concerning the litigation.

Executive session notices, agendas, minutes, summaries, or recordings referencing discussion of the Ingka IRI litigation.

Any insurance notifications, coverage communications, or indemnification documents related to the lawsuit.

Any public statements, press releases, meeting announcements, or agenda references concerning the litigation.

Any internal memoranda, reports, analyses, or briefing materials prepared for Council regarding the litigation.

I am requesting inspection of these records at a mutually convenient time during regular business hours. If any portion of the requested records is claimed to be exempt from disclosure, please identify the specific statutory exemption relied upon and provide a written explanation as required by S.C. Code Ann. §30-4-30(c).

If the County maintains a written policy requiring use of a specific form for FOIA requests, please provide a copy of that policy and the authority under which it was adopted.

Please confirm within the timeframes required by law when the requested records will be made available for inspection.

Thank you for your attention to this matter.

Sincerely,

Lathonia Bennett

Lathonia Bennett, DDS
JustUs CPP

A10

2026 - 584
Electronic Filing
From: Corporation Service Company
Thru: ERX

Instrument  Book  Volume  Page
2026 - 584   OR    872     143

## NOTICE OF MECHANICS' LIEN
## (CLAIMANT WITHOUT DIRECT CONTRACT WITH OWNER)

CLERK OF COURT/REGISTER OF DEEDS )
STATE OF SOUTH CAROLINA )
COUNTY OF Williamsburg )
)
)
)
)

2026 - 584
Filed for Record in
WILLIAMSBURG COUNTY, SC
DEITRA M. JOHNSON, CLERK OF COURT
03/05/2026 03:48:48 PM
MECH LIEN  $25.00
Bk OR Vol 872 Page 143 - 147

TO: OWNER: KINGSTREE WEST 115 LLC and INGKA INVESTMENTS FOREST ASSETS LLC, 420 ALAN WOOD RD, CONSHOHOCKEN, PA 19428.

PLEASE TAKE NOTICE that claimant has provided certain equipment, labor or materials for which they have not been paid in full:

1.    Claimant has furnished the following equipment, labor or materials actually used in the erection, alteration, or repair of a building or structure upon the property intended to be covered by the lien (which is described below): Various Construction Equipment Rentals.

2.    The equipment, labor or materials were furnished in connection with the property located at: 2279 MANNING HWY , GREELEYVILLE, SC 29045, in the County of Williamsburg APN #: 45-046-003.

3.    The equipment, labor or materials were furnished by the claimant at the special instance and request of the Owner, or by an entity or persons authorized by, or rightfully acting for, the owner(s) of the property.

4.    A just and true account of the amount due Claimant, with all just credits given, which is $27,366.20 , is attached and incorporated by reference.

5.    The name of the owner of the property, if known is: KINGSTREE WEST 115 LLC and INGKA INVESTMENTS FOREST ASSETS LLC.

6.    Claimant last performed labor on the property or furnished materials and/or equipment for the improvement of the property on: 01/19/2026. Accordingly, this Notice of Mechanics' Lien with Statement of Account is being filed and served within ninety (90) days from the date labor was last performed on, and materials or equipment were last furnished to, the property.

I am not required to be licensed or registered as contemplated by S.C. Code Ann. 29-5-15.

CLAIMANT: Sunbelt Rentals, Inc.

By: _____
SHANNON WILLIAMS, LIEN ADMIN
Lien Administrator

State of _____
County of _____

Subscribed and sworn to (or affirmed) before me on this  4  day of  March  20 2__, by
SHANNON WILLIAMS, LIEN ADMIN, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature _____  (Seal)

File: 17000582





An Informa TechTarget Publication

 HR DIVE

# 'Months of obfuscation': Ikea's evidence destruction costs $566K

A court had ordered the employer to produce email files related to ongoing age discrimination litigation.

Published July 30, 2024

Caroline Colvin
Reporter

*A sign for an Ikea furniture store is seen on Feb. 26, 2024, in Round Rock, Texas. Ikea deleted the emails of HR and management personnel in "the regular course of business, based on when that individual departed IKEA," lawyers said in a letter provided to the court. Brandon Bell via Getty Images*

Ikea must pay $566,000 for "spoliation of evidence" after deleting the emails of at least four workers after the company had been ordered to preserve them, a federal judge ordered last week.

The alleged evidence destruction is related to a series of ongoing class-action age discrimination lawsuits against the company that began in 2018. In 2019, the parties associated with three of those lawsuits — *Donofrio v. Ikea US Retail*, *Antonelli v. Ikea US Retail* and *Paine v. Ikea Holding US* — "agreed to consolidated, joint discovery following the conclusion of their respective opt-in notice periods in those cases in an effort to conserve resources and avoid duplicative discovery efforts," according to a court filing.

## How IKEA obscured evidence

The court, in April 2022, ordered Ikea to produce electronically stored information, specifically the email files of the company's U.S. chief human resources officer; the global head of equality, diversity and inclusion; and the human resources/recruitment manager — along with several Ikea store managers.

Opt-Out Signal Honored

4:26-cv-01034-JD-PJG    Date Filed 05/19/26    Entry Number 93-4    Page 17 of 58

The furniture company's attorneys said it would take eight months to produce the information; the court ordered Ikea to provide the information on a rolling basis, to be completed no later than the end of the year. By January 2023, however, Ikea had provided none of the requested emails.

Following "months of obfuscation," Ikea lawyers "finally admitted" that the company had not done the required search and had deleted the email files of the key players in "the regular course of business, based on when that individual departed IKEA," according to a letter provided to the court. "At the time of the departure, IKEA had no reasonable basis to believe it needed to preserve their email files."

Still, as the court noted, "when read carefully, the explanation does not say that the emails were deleted at the time of the employee's departure. Rather, it says they were deleted based on when that individual departed IKEA."

## Why Ikea had to pay half a million dollars

In May 2024, the court ruled that Ikea engaged in spoliation of evidence and had violated a court order. In a July 22 memorandum, the judge ordered Ikea to pay $566,731.53 in attorney fees and expenses, reduced slightly from the plaintiffs' requested $644,646.64.

The cases are ongoing, with Ikea most recently moving to have certain claims dismissed. The plaintiffs' age discrimination arguments center around allegations that Ikea's corporate culture favors younger employees through leadership development initiatives, promotional practices and efforts to demote or push out older workers.

Opt-Out Signal Honored

4/20/2026, 9:17 AM

A-17

A 12



ore FILE - In this Wednesday, Nov. 30, 2013 file photo, customers leave an IKEA store in Plaisir, west of Paris. A French court has ordered home furnishings giant Ikea to pay more than $1.2 million in fines and damages Tuesday, June 15, 2021 over a campaign to spy on union representatives. (AP Photo/Remy de la Mauviniere, File)

**BY NICOLAS VAUX-MONTAGNY**

Published 10:58 AM EDT, June 15, 2021

VERSAILLES, France (AP) — A French court ordered home furnishings giant Ikea to pay some 1.1 million euros ($1.3 million) in fines and damages Tuesday over a campaign to spy on union representatives, employees and some unhappy customers in France.

Two former Ikea France executives were convicted and fined over the scheme and given suspended prison sentences. Among the other 13 defendants in the high-profile trial, some were acquitted and others given suspended sentences.

Adel Amara, a former Ikea employee who helped expose the wrongdoing, called the ruling "a big step in defense of the citizen....It makes me glad that there is justice in France."

The panel of judges at the Versailles court found that between 2009 and 2012, Ikea's French subsidiary used espionage to sift out trouble-makers in the employee ranks and to profile squabbling customers.



ADVERTISEMENT



**Pressure Washers**
**Becoming Obsolete**

Aquavia

Ikea France was convicted of receiving personal data obtained through fraudulent means in a habitual way, and ordered to pay 1 million euros in fines and about 100,000 euros ($121,225) in damages.

Ingka Group, which owns and operates most Ikea stores, noted in a statement after the verdicts that the French retail operation "has strongly condemned the practices, apologized and implemented a major action plan to prevent this from happening again."

"We will now review the court's decision in detail and consider if and where any additional measures are necessary," the group said.

Trade unions accused Ikea France of collecting personal data by fraudulent means, notably via illegally obtained police files, and illicitly disclosing personal information. Lawyers for Ikea France denied that the company had any strategy of "generalized espionage."

A lawyer for the unions, Solene Debarre, expressed hope that the verdict would "make some companies tremble."

"One million euros isn't much for Ikea, but it's a symbol," Debarre said.

ADVERTISEMENT

The company, which said it cooperated in the investigation, had faced a potential financial penalty of up to 3.75 million euros ($4.5 million). Prosecutor Pamela Tabardel asked the court to hand "an exemplary sentence and a strong message to all companies."

The executive who was in charge of risk management at the time of the spying, Jean-François Paris, to 630,000 euros a year were earmarked for such investigations. Paris — the only official to have adm department was responsible for handling the operation on orders from former Ikea France CEO Jea



Paris was convicted of fraudulently gathering personal data, fined 10,000 euros ($12,125) and given

Baillot, who denied ordering a spy operation, was convicted of receiving fraudulently collected data 50,000 euros ($60,626) and given a two-year suspended sentence.

Another former CEO of Ikea France was acquitted for lack of evidence.

4/17/2026, 4:19 PM

4:26-cv-01034-JD-RJG    Date Filed 05/19/26    Entry Number 93-4    Page 20 of 58

Ikea France's lawyer, Emmanuel Daoud, said the company hadn't decided whether to appeal. He said the case was marked by a lack of hard evidence, and noted that the fines were well below the maximum possible.

A
D
V
E
R
T
IS
E
M
E
N
T

"The court took into account the action plan that Ikea put in place after the revelation of the facts, in 2012. That's very satisfying," Daoud said.

The company fired four executives and changed internal policy after French prosecutors opened a criminal probe in 2012.

Trade unions alleged that Ikea France paid to gain access to police files that had information about targeted individuals, particularly union activists and customers who were in disputes with Ikea.

In one situation, Ikea France was accused of using unauthorized information to try to catch an employee who had claimed unemployment benefits but drove a Porsche. In another alleged instance of illegal prying, the subsidiary reportedly investigated an employee's criminal record to determine how the employee was able to own a BMW on a low income.

The company also faces potential damages from separate civil lawsuits filed by unions and 74 employees.

Ikea's France subsidiary employs more than 10,000 people in 34 stores, an e-commerce site and a customer support center.

——

This story corrects the spelling of the first name of former employee to Adel, not Abel.

——

Jeffrey Schaeffer in Versailles and Elaine Ganley in Paris contributed.



HO4

Confirmation of EDA Guidance & Submission of Partnership Resolution (JustUs CPP & Williamsburg County)

From: lathonia@justuscpp.org (lathonia@justuscpp.org)

To: kwashington@wc.sc.gov; tammi.mcclary@wc.sc.gov; summer.baxley@wc.sc.gov

Cc: hsherman@eda.gov

Date: Wednesday, September 10, 2025 at 10:49 PM UTC

County Council,

I spoke with **Ms. Helen Sherman** at the U.S. Economic Development Administration (EDA) regarding partnership documentation for federal grants involving a municipality and a nonprofit. **Ms. Sherman confirmed** that:

- **EDA does not require a specific "partnership form."**

- The **relationship terms (ownership, operations, and maintenance)** must be **agreed upon between the parties** and documented.

- **No local funding contribution is required by Williamsburg County** as a condition of partnership.

- EDA welcomes a **Letter of Support (LOS)** from the County and a **Resolution** delineating roles and responsibilities for clarity.

Per that guidance, I'm submitting the attached **Resolution—Grant Partnership** for Council's consideration. In summary:

- **Primary Applicant:** *JustUs Community Perpetualization Project (JustUs CPP, Inc.)*

    o Will **own, operate, and maintain** the project.

    o Assumes **general and professional liability** for the project.

- **Secondary Partner (Williamsburg County):**

    o May provide **consulting, advocacy, and discretionary contributions** (including technical support), at the County's election.

    o May request amendments if there are **substantive concerns** regarding scope, compliance, or risk.

If any aspect of my understanding is inaccurate, **Ms. Sherman (cc'd)** can correct the record directly. For convenience, she can also be reached at **(828) 707-2748** or **hsherman@eda.gov**

**Respectfully,**

Lathonia Bennett, DDS
JustUs CPP
PO Box 1010
Kingstree, SC 29556
843 800-0087
912 996-3303
lathonia@justuscpp.org

https://www.zeffy.com/en-US/donation-form/1ff7a778-a870-4dfb-90e0-7ad3a45c57c9

 Resolution outlining partnership agreement and responsibilities for Community projects.pdf
113.9

# Resolution No. _____-_____-_____

**A Resolution Establishing a Federal Grant Partnership with JustUs Community Perpetualization Project (JustUs CPP, Inc.) for the Purpose of Submitting a Joint Application for Federal Funding**

**WHEREAS,** the Williamsburg County Government recognizes the importance of pursuing federal grant opportunities to strengthen community development, housing, workforce training, and related initiatives; and

**WHEREAS,** JustUs Community Perpetualization Project (JustUs CPP, Inc.), a duly organized nonprofit entity, has proposed to serve as the *primary applicant* and lead implementing partner for a federal grant project that aligns with the County's priorities for sustainable housing, workforce development, and economic revitalization; and

**WHEREAS,** federal regulations require that all projects funded under federal grants comply with the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 CFR 200), including clear delineation of responsibilities among primary applicants and subrecipients or partners; and

**WHEREAS,** it is necessary to establish a written agreement between the parties to define ownership, operations, liability, and permissible activities of the partnership;

**NOW, THEREFORE, BE IT RESOLVED** by the Williamsburg County Council as follows:

- **Designation of Primary Applicant**
  - JustUs Community Perpetualization Project (JustUs CPP, Inc.) is hereby designated as the *primary applicant* for the federal grant submission.
  - As primary applicant, JustUs CPP shall own, operate, and maintain the project.
  - The secondary partner (Williamsburg County) may contribute funding or resources at its discretion, including but not limited to technical support, advocacy, or programmatic assistance.
- **Role of Secondary Applicant (Municipality)**
  - The Municipality shall serve as the *secondary partner* and may provide consulting, advocacy, and supportive contributions at its discretion.
  - The Municipality's contributions may include, but are not limited to, technical assistance, community outreach, and facilitation of compliance with local planning requirements.
- **Liability and Risk Management**
  - The primary applicant, JustUs CPP, shall assume responsibility for both general and professional liability associated with the project.

- o The Municipality shall not bear liability for project operations, except as otherwise required by law or mutually agreed upon in writing.

- **Compliance with Federal Regulations**
  - o Both parties shall ensure that the project complies fully with the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (2 CFR 200).
  - o A written subrecipient or partnership agreement shall be executed to detail roles, responsibilities, reporting requirements, and allowable costs in accordance with federal standards.
- **Flexibility for Secondary Applicant**
  - o Should the Municipality identify substantive concerns regarding the scope, liability, or compliance obligations, the terms of this resolution may be amended to reflect mutually agreed modifications.
- **Authorization to Proceed**
  - o The appropriate municipal officers are authorized to collaborate with JustUs CPP to finalize the required federal grant application forms and execute any necessary subrecipient or partnership agreements.

**BE IT FURTHER RESOLVED** that this Resolution shall take effect immediately upon its adoption.

**Adopted this ___ day of _____, 2025**
By order of [Name of Municipality] Council

| | |
|---|---|
| **County Supervisor** | |
| **District 1 Representative** | |
| **District 2 Representative** | |
| **District 3 Representative** | |
| **District 4 Representative** | |
| **District 5 Representative** | |
| **District 6 Representative** | |
| **District 7 Representative** | |
| **Clerk of Council** | |

4:26-cv-01034-JD-PJG Date Filed 05/19/26 Entry Number 83-4 Page 24 of 58

HOC

## Re: RE: [External] Follow-Up and Request for Clarification on Grant Partnership

From: Cheryl Lane (blackriverguardians@gmail.com)

To: lathonia@justuscpp.org

Date: Tuesday, November 11, 2025 at 04:47 PM UTC

Hi, thanks for the update...HMM? very interesting.

I have been swamped trying to get ready for the planning commission meeting on the 18th. I found the final draft of the Comp Plan with all of the comments by Leigh Kane of the Waccamaw Council of Governments. She really did a good job with telling them where the problem areas are in the document. I am trying to cut and paste the comments into a document that the planning commission can review.

Good job on holding the county accountable!

Talk soon. Mark your calendar for council and planning commission meetings!

I am continuing to stir the pot.

The "very suspicious" solar panels have arrived from China. The are the very ones that have been noted as containing spyware from China. What better place to put them than on the eastern coast, with military bases all around..We have military operations doing flyovers all the time here...and close proximity to Washington DC, too. Cheerios or Fruitloops or something!!

Cheryl

On Sun, Nov 9, 2025 at 9:19 PM Lathonia Bennett <lathonia@justuscpp.org> wrote:

Says there is no nonprofit.

---------- Original Message ----------

From: "Washington, Kelvin" <KWashington@wc.sc.gov>

To: "lathonia@justuscpp.org" <lathonia@justuscpp.org>

Date: 11/07/2025 1:32 PM EST

Subject: RE: [External] Follow-Up and Request for Clarification on Grant Partnership

Good afternoon Dr. Bennett,

Please accept my apologies for the slow response. I have been extremely busy the last few days. Please forward me your grant partnership request again if you don't mind. Also, I have not established a nonprofit. Can you elaborate on that for me please? I look forward to hearing from you soon. Thanks

Kelvin Washington

Williamsburg County Supervisor

From: lathonia@justuscpp.org <lathonia@justuscpp.org>

Sent: Thursday, November 6, 2025 5:00 PM

To: Washington, Kelvin <KWashington@wc.sc.gov>; Baxley, Summer <summer.baxley@wc.sc.gov>

Cc: chrystan@carltonlaw.com

Subject: [External] Follow-Up and Request for Clarification on Grant Partnership

Dear Supervisor Washington,

I hope this message finds you well. I am following up regarding the grant partnership we previously discussed and your public expression of support for this initiative. As of today, I have not received confirmation or any updates about next steps or a projected timeline, and I wanted to reach out for clarity on where things currently stand.

There is a growing concern within the community regarding transparency and communication surrounding collaborative projects, including this one. As you know, trust and open dialogue are essential for effective partnerships and for ensuring that our collective efforts truly benefit the community.A specific timeline would be helpful for other collaboration

Additionally, I would appreciate clarification on how your recently established nonprofit organization aligns with or differs from the goals of the proposal we discussed. Given the overlap in focus areas, it is important that all parties understand how these efforts can complement rather than duplicate or complicate one another.

My goal in raising these questions is to foster transparency, accountability, and cooperation. I remain committed to working collaboratively toward outcomes that serve the best interests of our residents and hope we can reestablish clear communication moving forward.

Thank you for your attention to these matters. I look forward to your response and to identifying a constructive path forward.

Regards,


Lathonia Bennett, DDS
Director
JustUs CPP
PO Box 1010
Kingstree, SC. 29556
912-996-3303
lathonia@justuscpp.org
https://justuscpp.org


**Lathonia Bennett, Director**
**JustUs CPP**
**PO Box 1010**
**Kingstree, SC 29556**
**843 800-0087**
**912 996-3303**
lathonia@justuscpp.org
https://justuscpp.org
paypal.com/us/fundraiser/charity/5603666

https://www.zeffy.com/en-US/donation-form/1f7a778-a870-4dfb-90e0-7ad3a45c57c9

# Bennett v. Williamsburg County

## Structural Conflict Network — Exhibit to 28 U.S.C. § 1746 Declaration

### Case No. 4:26-cv-01034-JD-PJG
### United States District Court, District of South Carolina, Florence Division

**COLOR KEY**
- Legal / Jenkinson firm
- Shuler-McGill family (obituary-confirmed)
- McGill political dynasty / legislative
- Development / utility entities
- Defense counsel – The Smith Loop
- WCDC board cross-appointment
- ★ Named defendant in this action

This exhibit presents five network maps documenting the structural conflicts of interest confirmed by public record in the above-captioned litigation. Each map isolates a distinct layer of the governance network. Map 5 presents all connections simultaneously.

All connections depicted herein are confirmed by at least one of the following public record sources: published court opinions; official government websites; SC Attorney General press releases; NESA official organizational records; published obituaries; legal directory profiles; SC Legislature bill records; Post and Courier, SCNow, FITSNews, and WPDE reporting; and official cooperative management and board pages.



**MAP 1 — THE LEGAL HUB: JENKINSON, KELLAHAN NETWORK & SHULER-MCGILL FAMILY**



**MAP 2 — UTILITY CAPTURE: WCDC BOARD CROSS-APPOINTMENTS**



**MAP 3 — THE SMITH LOOP: NESA PIPELINE, ENERGY SECURITY ACT & DEFENSE FIRMS**



**MAP 4 — COMMUNITY EXCLUSION: FTC GRANTS, WCDC BOARD & JUSTUS CPP REFUSALS**



**MAP 5 — COMPREHENSIVE NETWORK (ALL CONNECTIONS)**

**LINE KEY**
- —— Primary Structural Conflict
- ——— Confirmed Relationship
- - - - Professional / Organizational Connection

★ = Named Defendant in This Action

Interactive HTML version provided simultaneously by electronic transmission to the Court and to defense counsel, allowing individual network layers to be isolated.

Submitted by: Lathonia Bennett, DDS, Pro Se Plaintiff
JustUs Community Perpetualization Project, Inc. · P.O. Box 1010, Kingstree, SC 29556 · (912) 996-3303 · lathonia@justuscpp.org · May 6, 2026

14002470.1.125-

```
NAME OF THE ENGINEER: BRIAN (Certified Technician )
LEVEL: LEVEL 7 NETWORK ENGINEER ( SR. Security Expert)
OFFICE ID : MB424563( L7 TECHNICIAN)
-----------------------------------------------------------------
ISSUE: NETWORK / SECURITY BREACH / IP AND NETWORK HACKED
SECURE SERVER: CONNECTED
NETWORK FIREWALL: NOT FOUND (Internet shield)
TYPE OF INFECTION: TROJAN INFECTION (SPYWARE)
=================================================================
CASE ID : SB478556255
=================================================================

DIAGNOSTIC REPORT


-NETWORK AND IP HACKED BY RUNDELL32.EXE TROJAN. (Spyware)
-INFECTION RATE 98%. (Critical)
-BANKING IS ON RISK ON ALL DEVICES. (Critical)
-ALL PASSWORD'S, SSN NUMBER AND EMAIL ACCOUNT'S ARE ON RISK
-FOREIGN ( IP ) FOUND ON HOME NETWORK AND DEVICES..................... (Critical)
-ALL HOME DEVICES ARE INFECTED FROM TROJAN INFECTION.
-NO SECURITY FOUND ON THE HOME NETWORK AND ON DEVICE........... (Internet shield is missing )
-SECURITY AND SERVICE DRIVERS ARE NOT WORKING.
```

4:25-CV-01034-JD-PJG  Date Filed 05/19/26  Entry Number 93-4  Page 27 of 58

2-05



4:26-cv-01034-JD-PJG   Date Filed 05/19/26   Entry Number 93-4   Page 28 of 58

Why? How have i offended you?

You mean invading

I promise you i'm so sorry, you were never a target, its not personal...found out the person and i;m illing to put a smile on your face , i swear to God

You are a bully and a

Lathonia i said i am verrrry sorry and i promise you, its noting personal to you , im beng nice here and even offering to give you some money, why would a bully do that! can even give u a job

Just try and listen to me please.in God's name

Predator, trying to make someone believe youare helping when you are just trying to scam and intimidate. You don't k oiw me yet you are in all of my files and data , using my name as if you know me.

I feel ashamed that i havemade you feel this way and i hope you give me a chance to make it up, like i said...i have nothing to scam off you, i got in here and found that im dealing with someone who might be needing my help, God sends help in different forms, i promise he wouldn't coe down from Heaven. But if you dont want it, i will teach u how to get me out of your system, you do it yourself so you are satisfied... I'm Wood by the way



Lathooo im sorry!

Your using my name even makes me sick. i did not give you my name
,
 would you ever forgive this and lets be cool?

There are billions of people on this planet, there may be someone who would be okay with this intrusion. I am not one of them. Don't prey on any kids, predator.

kids? you are definitely nota kid but yeah its fine i will leave

What's your name, criminal?

haha here we go again, Wood is my name Wood first or last ?first name Powalski last

where are you Wood?

how long have you beenstalking me, stalker

currently in Australia and inhave not been stalking you un sorry

prison?



# EXHIBIT A

## Aerial Depiction

ELECTRONICALLY FILED - 2025 Oct 15 4:18 PM - WILLIAMSBURG - COMMON PLEAS - CASE#2025CP4500491





FEE-IN-LIEU OF *AD VALOREM* TAXES AND

INFRASTRUCTURE CREDIT AGREEMENT

BETWEEN

SR GEORGETOWN, LLC,
AS SPONSOR, AND

SILICON RANCH CORPORATION,
AS SPONSOR AFFILIATE

AND

GEORGETOWN COUNTY, SOUTH CAROLINA

EFFECTIVE AS OF _____, 2025

i

4899-8507-2960 v.6

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| **ARTICLE I** | **DEFINITIONS** | 1 |
| Section 1.1. | *Terms* | 1 |
| **ARTICLE II** | **REPRESENTATIONS AND WARRANTIES** | 5 |
| Section 2.1. | *Representations and Warranties of the County* | 5 |
| Section 2.2. | *Representations and Warranties of the Sponsor.* | 5 |
| **ARTICLE III** | **THE PROJECT** | 6 |
| Section 3.1. | *The Project.* | 6 |
| Section 3.2 | *Leased Property* | 6 |
| Section 3.3. | *Filings and Reports* | 6 |
| **ARTICLE IV** | **FILOT PAYMENTS** | 6 |
| Section 4.1. | *FILOT Payments* | 6 |
| Section 4.2. | *FILOT Payments on Replacement Property* | 7 |
| Section 4.3. | *Removal of Components of the Project* | 7 |
| Section 4.4. | *Damage or Destruction of Economic Development Property* | 7 |
| Section 4.5. | *Condemnation* | 8 |
| Section 4.6. | *Calculating FILOT Payments on Diminution in Value* | 8 |
| Section 4.7. | *Payment of Ad Valorem Taxes* | 8 |
| Section 4.8. | *Place of FILOT Payments* | 8 |
| **ARTICLE V** | **ADDITIONAL INCENTIVES** | 8 |
| Section 5.1. | *Infrastructure Credits* | 8 |
| **ARTICLE VI** | **CLAW BACK** | 9 |
| Section 6.1. | *Claw Back* | 9 |
| **ARTICLE VII** | **DEFAULT** | 9 |
| Section 7.1. | *Events of Default* | 9 |
| Section 7.2. | *Remedies on Default* | 10 |
| Section 7.3. | *Reimbursement of Legal Fees and Other Expenses* | 10 |
| Section 7.4. | *Remedies Not Exclusive* | 11 |
| **ARTICLE VIII** | **PARTICULAR RIGHTS AND COVENANTS** | 11 |
| Section 8.1. | *Right to Inspect* | 11 |
| Section 8.2. | *Confidentiality* | 11 |
| Section 8.3. | *No Liability of County Personnel* | 11 |
| Section 8.4. | *Assignment* | 11 |
| Section 8.5. | *No Double Payment; Future Changes in Legislation* | 11 |
| Section 8.6. | *Administration Expenses* | 12 |
| Section 8.7. | *Multicounty Park* | 12 |
| Section 8.8. | *Limitation of Liability* | 12 |
| Section 8.7. | *Indemnification* | 12 |
| **ARTICLE IX** | **SPONSOR AFFILIATES** | 133 |
| Section 9.1. | *Sponsor Affiliates* | 133 |
| Section 9.2. | *Primary Responsibility* | 133 |

4899-8507-2960 v.6

**ARTICLE X          MISCELLANEOUS** ................................................................................ 133

Section 10.1.      *Notices* ........................................................................................ 133
Section 10.2.      *Provisions of Agreement for Sole Benefit of County and Sponsor* ................ 144
Section 10.3.      *Counterparts* ................................................................................ 144
Section 10.4.      *Governing Law* .............................................................................. 144
Section 10.5.      *Headings* ..................................................................................... 144
Section 10.6.      *Amendments* ................................................................................ 144
Section 10.7.      *Agreement to Sign Other Documents* ................................................... 144
Section 10.8.      *Interpretation; Invalidity; Change in Laws* ........................................... 15
Section 10.9.      *Force Majeure* ............................................................................... 155
Section 10.10.     *Termination; Termination by Sponsor* .................................................. 155
Section 10.11.     *Entire Agreement* ........................................................................... 155
Section 10.12.     *Waiver* ........................................................................................ 15
Section 10.13.     *Business Day* ................................................................................ 16
Section 10.14.     *Agreement's Construction* ................................................................ 16

Exhibit A – Description of Property
Exhibit B – Form of Joinder Agreement
Exhibit C – Description of Infrastructure Credit

4899-8507-2960 v.6

# SUMMARY OF CONTENTS OF
# FEE AGREEMENT

The parties have agreed to waive the requirement to recapitulate the contents of this Fee Agreement pursuant to Section 12-44-55 of the Code (as defined herein). However, the parties have agreed to include a summary of the key provisions of this Fee Agreement for the convenience of the parties. This summary is included for convenience only and is not to be construed as a part of the terms and conditions of this Fee Agreement.

| PROVISION | BRIEF DESCRIPTION | SECTION REFERENCE |
|---|---|---|
| Sponsor Name | SR Georgetown, LLC | 1.1 |
| Project Location | Saints Delight Road, Georgetown County | |
| Tax Map No. | 01-0442-026-07-00 | |
| | | |
| | | |
| **FILOT** | | |
| • Phase Exemption Period | 40 years | 1.1 |
| • Investment Commitment | $2,500,000 | 1.1 |
| • Jobs Commitment | N/A | |
| • Investment Period | 10 years | 1.1 |
| • Assessment Ratio: | 6% | 4.1 |
| • Millage Rate | 244.2 mills | 4.1 |
| • Fixed or Five-Year Adjustable millage: | Fixed | 4.1 |
| • Claw Back information | Failure to reach $2.5 million terminates the Agreement | 6.1 |
| **Multicounty Park** | Georgetown County – Williamsburg County | 1.1 |
| **Infrastructure Credit** | | |
| • Brief Description | Amount necessary to fix annual payment at $3,600 per MWac | Exhibit C |
| • Credit Term | Term of agreement | Exhibit C |
| • Claw Back information: | Failure to reach $2.5 million terminates the Agreement<br><br>Pro-rata claw back if not at least $55 million investment is reached within the Investment Period | 6.1 |
| **Other information** | | |

iv

4899-8507-2960 v.6

## FEE-IN-LIEU OF *AD VALOREM* TAXES AND

## INFRASTRUCTURE CREDIT AGREEMENT

THIS FEE-IN-LIEU OF *AD VALOREM* TAXES AND INFRASTRUCTURE CREDIT AGREEMENT ("*Fee Agreement*") is entered into, effective, as of _____, 2025, between Georgetown County, South Carolina ("*County*"), a body politic and corporate and a political subdivision of the State of South Carolina ("*State*"), acting through the Georgetown County Council ("*County Council*") as the governing body of the County, and SR Georgetown, LLC, a limited liability company organized and existing under the laws of the State of Delaware ("*Sponsor*") and Silicon Ranch Corporation, a Delaware corporation, as a Sponsor Affiliate.

### WITNESSETH:

(a) Title 12, Chapter 44, ("*Act*") of the Code of Laws of South Carolina, 1976, as amended ("*Code*"), authorizes the County to induce manufacturing and commercial enterprises to locate in the State or to encourage manufacturing and commercial enterprises currently located in the State to expand their investments and thus make use of and employ the manpower, products, and other resources of the State by entering into an agreement with a sponsor, as defined in the Act, that provides for the payment of a fee-in-lieu of *ad valorem* tax ("*FILOT*") with respect to Economic Development Property, as defined below;

(b) Sections 4-1-170, 4-1-175, 4-29-68 and 12-44-70 of the Code authorize the County to (i) create multi-county industrial parks in partnership with contiguous counties; (ii) include the property of eligible companies within such parks as an inducement to locate within the County, which inclusion under the terms of Section 13 of Article VIII of the Constitution of the State of South Carolina makes such property exempt from ad valorem property taxes, therefore changing the character of the annual receipts from such properties from ad valorem property taxes to FILOT payments; and (iii) grant an annual tax credit against such FILOT payments in order to assist a company in paying the cost of designing, acquiring, constructing, improving, or expanding the infrastructure serving the property of any company located within such multi-county industrial parks or for improved or unimproved real estate and personal property including machinery and equipment used in the operation of a commercial enterprise located within such multi-county parks in order to enhance the economic development of the County;

(c) The Sponsor has committed to establishing a commercial enterprise ("*Facility*") in the County, consisting of investment in real and personal property of approximately $55,000,000;

(d) By an ordinance enacted on October [], 2025, County Council authorized the County to enter into this Fee Agreement with the Sponsor to provide for a FILOT and the other incentives as more particularly described in this Fee Agreement to induce the Sponsor to locate its Facility in the County.

NOW, THEREFORE, AND IN CONSIDERATION of the respective representations and agreements hereinafter contained, parties agree as follows:

### ARTICLE I
### DEFINITIONS

**Section 1.1.** *Terms.* The defined terms used in this Fee Agreement have the meaning given below, unless the context clearly requires otherwise.

From time to time herein, reference is made to the term taxes or ad valorem taxes. All or portions of the Project are or will be located in a Multicounty Park and, as such, are or will be exempt from ad valorem taxation under and by virtue of the provisions of Paragraph D of Section 13 of Article VIII of the S.C.

1

4899-8507-2960 v.6

Constitution and the MCIP Act (as defined herein). With respect to facilities located in a Multicounty Park and not subject to this Fee Agreement, references to taxes or ad valorem taxes means the fees-in-lieu of ad valorem taxes provided for in the MCIP Act, as the context may require.

"*Act*" means Title 12, Chapter 44 of the Code, as the Act may be amended from time to time and all future acts successor or supplemental thereto.

"*Act Minimum Investment Requirement*" means an investment of at least $2,500,000 in the Project by the Sponsor or a Sponsor Affiliate within five years of the Commencement Date, or a combined total investment of at least $5,000,000 in the Project by the Sponsor and one or more Sponsor Affiliates, regardless of the amount invested by each such party, within five years of the Commencement Date.

"*Administration Expenses*" means the reasonable out-of-pocket expenses incurred by the County in the negotiation, approval and execution of this Fee Agreement for reasonable attorney's fees. Administration Expenses do not include any costs, expenses, including attorney's fees, incurred by the County (i) after execution of this Fee Agreement, (ii) in defending challenges to the FILOT Payments, Infrastructure Credits or any other incentives provided by this Fee Agreement brought by any third parties; or (iii) any actions by the Sponsor or its affiliates and related entities; or (iv) in connection with matters arising prior to execution at the request of the Sponsor outside of the immediate scope of this Fee Agreement.

"*Code*" means the Code of Laws of South Carolina, 1976, as the same may be amended from time to time.

"*Commencement Date*" means the last day of the property tax year during which Economic Development Property is placed in service. The Commencement Date shall not be later than the last day of the property tax year which is three years from the year in which the County and the Sponsor enter into this Fee Agreement. For purposes of this Fee Agreement, the Commencement Date is expected to be December 31, 2026.

"*Contract Minimum Investment Requirement*" means an investment of $55,000,000 within the Investment Period by the Sponsor and any Sponsor Affiliates, as measured by the cost of the Project without regard to any depreciation.

"*County*" means Georgetown County, South Carolina, a body politic and corporate and a political subdivision of the State, its successors and assigns, acting by and through the County Council as the governing body of the County.

"*County Council*" means the Georgetown County Council, the governing body of the County.

"*Credit Term*" means the years during the Fee Term in which the Infrastructure Credit is applicable, as described in Exhibit C.

"*Department*" means the South Carolina Department of Revenue.

"*Diminution in Value*" means a reduction in the fair market value of Economic Development Property, as determined in Section 4.1(a)(i) of this Fee Agreement, which may be caused by (i) the removal or disposal of components of the Project pursuant to Section 4.3 of this Fee Agreement; (ii) a casualty as described in Section 4.4 of this Fee Agreement; or (iii) a condemnation as described in Section 4.5 of this Fee Agreement.

"*Economic Development Property*" means those items of real and tangible personal property of the Project placed in service not later than the end of the Investment Period that (i) satisfy the conditions of classification as economic development property under the Act, and (ii) are identified by the Sponsor in its annual filing of a PT-300S or comparable form with the Department (as such filings may be amended from time to time).

2

4899-8507-2960 v.6

"*Equipment*" means machinery, equipment, furniture, office equipment, and fixtures, together with any and all additions, accessions, replacements, and substitutions.

"*Event of Default*" means any event of default specified in Section 7.1 of this Fee Agreement.

"*Fee Agreement*" means this Fee Agreement.

"*Fee Term*" means the period from the effective date of this Fee Agreement until the Final Termination Date.

"*FILOT Payments*" means the amount paid or to be paid in lieu of *ad valorem* property taxes as provided in Section 4.1. and before taking into account any Infrastructure Credit. For the avoidance of doubt, should any part or all of the Project not be eligible as Economic Development Property, the FILOT Payment shall also mean, in such case, the payments in lieu of taxes made as a result of the Project being located in a Multicounty Park.

"*Final Output*" has the meaning as described on Exhibit C.

"*Final Phase*" means the Economic Development Property placed in service during the last year of the Investment Period.

"*Final Termination Date*" means the date on which the last FILOT Payment with respect to the Final Phase is made, or such earlier date as the Fee Agreement is terminated in accordance with the terms of this Fee Agreement.

"*Fixed FILOT Payment*" has the meaning as described on Exhibit C.

"*Improvements*" means all improvements to the Real Property, including buildings, building additions and improvements, roads, sewer lines, and infrastructure, together with all additions, fixtures, accessions, replacements, and substitutions.

"*Infrastructure*" means (i) the infrastructure serving the County or the Project, (ii) improved and unimproved real estate, and (iii) personal property, including machinery and equipment, used in the operation of a manufacturing or commercial enterprise, and such other items as may be described in or permitted under Section 4-29-68 of the Code.

"*Infrastructure Credit*" means the special source revenue credit provided to the Sponsor pursuant to Section 12-44-70 of the Act, Section 4-1-175 of the MCIP Act and Section 5.1 of this Fee Agreement, with respect to the Infrastructure. Infrastructure Credits are to be used for the payment of the costs of the Infrastructure.

"*Investment Period*" means the period beginning with the first day of any purchase or acquisition of Economic Development Property and ending ten (10) years after the Commencement Date. For purposes of this Fee Agreement, the Investment Period, unless the Commencement Date is later than December 31, 2026, is expected to end on December 31, 2036.

"*MCIP Act*" means Article VIII, Section 13(D) of the Constitution of the State of South Carolina, and Sections 4-1-170, 4-1-172, 4-1-175, and 4-29-68 of the Code.

"*Multicounty Park*" means the multicounty industrial or business park governed by the Agreement for Development of Joint County Industrial and Business Park, dated as of October 23, 2018, between the County and Williamsburg County, South Carolina, as amended from time to time.

3

4899-8507-2960 v.6

"*Net FILOT Payment*" means the FILOT Payment net of the Infrastructure Credit.

"*Phase*" means the Economic Development Property placed in service during a particular year of the Investment Period.

"*Phase Exemption Period*" means, with respect to each Phase, the period beginning with the property tax year the Phase is placed in service during the Investment Period and ending on the Phase Termination Date.

"*Phase Termination Date*" means, with respect to each Phase, the last day of the property tax year which is the 39th year following the first property tax year in which the Phase is placed in service.

"*Project*" means all the Equipment, Improvements, and Real Property in the County that the Sponsor determines to be necessary, suitable, or useful by the Sponsor in connection with its investment in the County.

"*Real Property*" means real property that the Sponsor uses or will use in the County for the purposes that Section 2.2(b) describes, and initially consists of the land identified on Exhibit A of this Fee Agreement and shall also include such land located in the County which shall be noted on schedules or supplements to Exhibit A, as may be provided by the Sponsor, provided that any requirement that the Sponsor provide such schedules or supplements with respect to future land may be satisfied by the Sponsor's (or Sponsor Affiliate's) filing with the Department of Form PT-300 with Schedule S attached listing such additional land, or such comparable form or schedule as the Department may provide in connection with projects subject to the Act.

"*Removed Components*" means Economic Development Property which the Sponsor, in its sole discretion, (a) determines to be inadequate, obsolete, worn-out, uneconomic, damaged, unsuitable, undesirable, or unnecessary pursuant to Section 4.3 of this Fee Agreement or otherwise; or (b) elects to be treated as removed pursuant to Section 4.4(c) or Section 4.5(b)(iii) of this Fee Agreement.

"*Replacement Property*" means any property which is placed in service as a replacement for any Removed Component regardless of whether the Replacement Property serves the same functions as the Removed Component it is replacing and regardless of whether more than one piece of Replacement Property replaces a single Removed Component.

"*Sponsor*" means SR Georgetown, LLC and any surviving, resulting, or transferee entity in any merger, consolidation, or transfer of assets; or any other person or entity which may succeed to the rights and duties of the Sponsor under this Fee Agreement.

"*Sponsor Affiliate*" means an entity that participates in the investment at the Project and, following receipt of any required County approval pursuant to Section 9.1 of this Fee Agreement, joins this Fee Agreement by delivering a Joinder Agreement, the form of which is attached as Exhibit B to this Fee Agreement. Silicon Ranch Corporation, a Delaware corporation, is the fee simple owner of the Real Property and is, by execution of this Fee Agreement a Sponsor Affiliate.

"*State*" means the State of South Carolina.

Any reference to any agreement or document in this Article I or otherwise in this Fee Agreement shall include any and all amendments, supplements, addenda, and modifications to such agreement or document.

The term "investment" or "invest" as used in this Fee Agreement includes not only investments made by the Sponsor, but also to the fullest extent permitted by law, those investments made by or for the benefit of the Sponsor in connection with the Project through federal, state, or local grants, in cash or in kind, to the extent such investments are or, but for the terms of this Fee Agreement and the Multicounty Park, would be subject to *ad valorem* taxes to be paid by the Sponsor.

4

4899-8507-2960 v.6

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES

**Section 2.1.** *Representations and Warranties of the County.* The County represents and warrants as follows:

(a) The County is a body politic and corporate and a political subdivision of the State and acts through the County Council as its governing body. The Act authorizes and empowers the County to enter into the transactions that this Fee Agreement contemplates and to carry out its obligations under this Fee Agreement. The County has duly authorized the execution and delivery of this Fee Agreement and all other documents, certificates or other agreements contemplated in this Fee Agreement and has obtained all consents from third parties and taken all actions necessary or that the law requires to fulfill its obligations under this Fee Agreement.

(b) Based on representations by the Sponsor, County Council evaluated the Project based on all relevant criteria including the purposes the Project is to accomplish, the anticipated dollar amount and nature of the investment resulting from the Project, and the anticipated costs and benefits to the County and following the evaluation, the County determined that (i) the Project is anticipated to benefit the general public welfare of the County by providing services, employment, recreation, or other public benefits not otherwise adequately provided locally; (ii) the Project gives rise to no pecuniary liability of the County or any incorporated municipality and to no charge against the County's general credit or taxing power; (iii) the purposes to be accomplished by the Project are proper governmental and public purposes; and (iv) the benefits of the Project are greater than the costs.

(c) The County identified the Project, as a "project" by adopting an inducement resolution, as defined in the Act, on _____, 2025.

(d) The County is not in default of any of its obligations (contractual or otherwise) as a result of entering into and performing its obligations under this Fee Agreement.

(e) The County has located or will take all reasonable action to locate and maintain the Project in the Multicounty Park or another multicounty business park established pursuant to the MCIP Act.

(f) The execution of this Agreement and the placement of the Project in the Multicounty Park do not, by itself and without more, result in a change in use of any Real Property classified as agricultural use property for South Carolina property tax purposes.

**Section 2.2.** *Representations and Warranties of the Sponsor.* The Sponsor represents and warrants as follows:

(a) The Sponsor is in good standing under the laws of the State of its organization, is duly authorized to transact business in the State (or will obtain such authority prior to commencing business in the State), has power to enter into this Fee Agreement, and has duly authorized the execution and delivery of this Fee Agreement.

(b) The Sponsor intends to operate the Project as a solar energy facility, and for such other purposes that the Act permits as the Sponsor may deem appropriate.

(c) The Sponsor's execution and delivery of this Fee Agreement, and its compliance with the provisions of this Fee Agreement do not result in a default under any agreement or instrument to which the Sponsor is now a party or by which it is bound.

(d) The Sponsor will use commercially reasonable efforts to achieve the Act Minimum Investment Requirement and the Contract Minimum Investment Requirement.

5

4899-8507-2960 v.6

(e) The execution and delivery of this Fee Agreement by the County and the availability of the FILOT Payments and other incentives provided by this Fee Agreement has been instrumental in inducing the Sponsor to locate the Project in the County.

(f) The Sponsor has retained legal counsel to confirm, or has had a reasonable opportunity to consult legal counsel to confirm, its eligibility for the FILOT and other incentives granted by this Fee Agreement and has not relied on the County, its officials, employees or legal representatives with respect to any question of eligibility or applicability of the FILOT and other incentives granted by this Fee Agreement.

## ARTICLE III
## THE PROJECT

**Section 3.1.** *The Project.* The Sponsor intends and expects to (i) construct or acquire the Project with an estimated Final Output of 50MWac; and (ii) meet the Act Minimum Investment Requirement and Contract Minimum Investment Requirement within the Investment Period. The Sponsor anticipates that the first Phase of the Project will be placed in service during the calendar year ending December 31, 2026. Notwithstanding anything contained in this Fee Agreement to the contrary, the Sponsor is not obligated to complete the construction of the Project. However, if the Contract Minimum Investment Requirement is not met, the benefits provided to the Sponsor, or Sponsor Affiliate, if any, pursuant to this Fee Agreement may be reduced, modified or terminated as provided in this Fee Agreement.

**Section 3.2** *Leased Property.* To the fullest extent that State law allows or is revised or construed to permit leased assets including real property, a building, or personal property to constitute Economic Development Property, then any property leased by the Sponsor is, at the election of the Sponsor, deemed to be Economic Development Property for purposes of this Fee Agreement.

**Section 3.3.** *Filings and Reports.*

(a) The Sponsor shall file a copy of this Fee Agreement and a completed PT-443 with the Department and the Auditor, Treasurer and Assessor of the County and partner county to the Multicounty Park.

(b) On request by the County Administrator, the Sponsor shall remit to the County copies of such records related to the calculation of the FILOT Payments and Fixed FILOT Payments due hereunder as the County would normally be entitled to in case the Project was subject to ad valorem taxation.

(c) In accordance with Exhibit C, the Sponsor shall report the Final Output to the County Administrator and County Auditor in writing contemporaneously with its report to the South Carolina Public Service Commission.

## ARTICLE IV
## FILOT PAYMENTS

**Section 4.1.** *FILOT Payments.*

(a) The FILOT Payment due with respect to each Phase through the Phase Termination Date is calculated as follows:

(i)     The fair market value of the Phase calculated as set forth in the Act, multiplied by

(ii)     An assessment ratio of six percent (6%), multiplied by

6

4899-8507-2960 v.6

(iii)    A fixed millage rate equal to the lowest legally allowed cumulative millage rate levied by or on behalf of all the taxing entities within which the Project is located as of June 30, 2025, which the parties believe to be 244.2 mills.

The calculation of the FILOT Payment must allow all applicable property tax exemptions except those excluded pursuant to Section 12-44-50(A)(2) of the Act. The Sponsor acknowledges that (i) the calculation of the annual FILOT Payment is a function of the Department and is wholly dependent on the Sponsor timely submitting the correct annual property tax returns to the Department, (ii) the County has no responsibility for the submission of returns or the calculation of the annual FILOT Payment, and (iii) failure by the Sponsor to submit the correct annual property tax return could lead to a loss of all or a portion of the FILOT and other incentives provided by this Fee Agreement.

(b) If a final order of a court of competent jurisdiction from which no further appeal is allowable declares the FILOT Payments invalid or unenforceable, in whole or in part, for any reason, the parties shall negotiate, in accordance with and subject to the terms of Section 10.8, the reformation of the calculation of the FILOT Payments to most closely afford the Sponsor with the intended benefits of this Fee Agreement.

**Section 4.2.** *FILOT Payments on Replacement Property.* If the Sponsor elects to place Replacement Property in service, then, pursuant and subject to the provisions of Section 12-44-60 of the Act, the Sponsor shall make the following payments to the County with respect to the Replacement Property for the remainder of the Phase Exemption Period applicable to the Removed Component of the Replacement Property:

(a) FILOT Payments, calculated in accordance with Section 4.1, on the Replacement Property to the extent of the original income tax basis of the Removed Component the Replacement Property is deemed to replace.

(b) Regular *ad valorem* tax payments to the extent the income tax basis of the Replacement Property exceeds the original income tax basis of the Removed Component the Replacement Property is deemed to replace.

**Section 4.3.** *Removal of Components of the Project.* The Sponsor is entitled to remove and dispose of components of the Project in its sole discretion. Components of the Project are deemed removed when scrapped, sold or otherwise permanently removed from the Project with the intent that it no longer be used for the Project. If the components removed from the Project are Economic Development Property, then the Economic Development Property is a Removed Component, no longer subject to this Fee Agreement and is subject to *ad valorem* property taxes to the extent the Removed Component remains in the State and is otherwise subject to *ad valorem* property taxes.

**Section 4.4.** *Damage or Destruction of Economic Development Property.*

(a) *Election to Terminate.* If Economic Development Property is damaged by fire, explosion, or any other casualty, then the Sponsor may terminate all or part of this Fee Agreement. In the property tax year in which the damage or casualty occurs and continues, the Sponsor is obligated to make FILOT Payments with respect to the damaged Economic Development Property only to the extent property subject to *ad valorem* taxes would have been subject to such taxes under the same circumstances for the period in question.

(b) *Election to Restore and Replace.* If Economic Development Property is damaged by fire, explosion, or any other casualty, and the Sponsor does not elect to terminate this Fee Agreement, then the Sponsor may restore and replace the Economic Development Property. All restorations and replacements made pursuant to this subsection (b) are deemed, to the fullest extent permitted by law and this Fee Agreement, to be Replacement Property.

7

4899-8507-2960 v.6

(c) *Election to Remove.* If Economic Development Property is damaged by fire, explosion, or any other casualty, and the Sponsor elects not to terminate this Fee Agreement pursuant to subsection (a) and elects not to restore or replace pursuant to subsection (b), then the damaged portions of the Economic Development Property are deemed Removed Components.

Section 4.5. *Condemnation.*

(a) *Complete Taking.* If at any time during the Fee Term title to or temporary use of the Economic Development Property is vested in a public or quasi-public authority by virtue of the exercise of a taking by condemnation, inverse condemnation, or the right of eminent domain; by voluntary transfer under threat of such taking; or by a taking of title to a portion of the Economic Development Property which renders continued use or occupancy of the Economic Development Property commercially unfeasible in the judgment of the Sponsor, the Sponsor shall have the option to terminate this Fee Agreement by sending written notice to the County within a reasonable period of time following such vesting.

(b) *Partial Taking.* In the event of a partial taking of the Economic Development Property or a transfer in lieu, the Sponsor may elect: (i) to terminate all or part of this Fee Agreement; (ii) to restore and replace the Economic Development Property, with such restorations and replacements deemed, to the fullest extent permitted by law and this Fee Agreement, to be Replacement Property; or (iii) to treat the portions of the Economic Development Property so taken as Removed Components with a corresponding pro rata downward adjustment of the Fixed FILOT Payment.

(c) In the year in which the taking occurs, the Sponsor is obligated to make FILOT Payments with respect to the Economic Development Property so taken only to the extent property subject to *ad valorem* taxes would have been subject to taxes under the same circumstances for the period in question.

Section 4.6. *Calculating FILOT Payments on Diminution in Value.* If there is a Diminution in Value, the FILOT Payments due with respect to the Economic Development Property or Phase so diminished shall be calculated by substituting the diminished value of the Economic Development Property or Phase for the original fair market value in Section 4.1(a)(i) of this Fee Agreement. For the avoidance of doubt, the Infrastructure Credit shall remain applicable to such adjusted FILOT Payment.

Section 4.7. *Payment of Ad Valorem Taxes.* If Economic Development Property becomes subject to *ad valorem* taxes as imposed by law, pursuant to this Fee Agreement, the Act, or otherwise, then the calculation of any *ad valorem* taxes due with respect to the Economic Development Property in a particular property tax year shall: (i) include the property tax reductions and exemptions that would have applied to the Economic Development Property as if it were not Economic Development Property; and (ii) include a credit for FILOT Payments the Sponsor has made with respect to the Economic Development Property.

Section 4.8. *Place of FILOT Payments.* All FILOT Payments shall be made directly to the County in accordance with applicable law.

## ARTICLE V
## ADDITIONAL INCENTIVES

Section 5.1. *Infrastructure Credits.* To assist in paying for costs of Infrastructure, the Sponsor is entitled to claim and the County hereby grants an Infrastructure Credit as described in Exhibit C hereof to reduce any FILOT Payments due and owing from the Sponsor to the County under this Fee Agreement. The term, amount and calculation of the Infrastructure Credit is described in Exhibit C. In no event may the Sponsor's aggregate Infrastructure Credit claimed pursuant to this Section exceed the aggregate expenditures by the Sponsor on Infrastructure.

8

For each property tax year in which the Infrastructure Credit is applicable ("Credit Term"), the County shall prepare and issue the annual bills with respect to the Project showing the FILOT Payment, calculated in accordance with Exhibit C and deducting therefrom the Infrastructure Credit. Provided, however, the Sponsor shall be required to report the Final Output to the County prior to the County preparing an annual bill with respect to the Project.

The parties agree that in the event the Commencement Date is not established by the last day of the property tax year that is three years from the year in which the County and the Sponsor entered into this Fee Agreement (i.e., later than December 31, 2028), this Fee Agreement shall not be invalidated, but the term of the Investment Period and the Term of this Fee Agreement shall, in such case, be deemed to have commenced as of December 31, 2028; provided, however, the Investment Period shall terminate on December 31, 2033, unless otherwise extended pursuant to the terms of this Fee Agreement. In case the Fee Agreement is, despite the parties intent, invalidated by a court of the State due to the Commencement Date being after December 31, 2028, the Company and the County agree this Fee Agreement shall apply.be converted to provide for a Infrastructure Credit equal to an amount needed to place the Company in the same financial position as if the Fee Agreement had not been invalidated.

## ARTICLE VI
## CLAW BACK

**Section 6.1.** *Claw Back.* (a) In the event that the cost of the Project (without regard to depreciation) that the Company acquires does not reach the Act Minimum Investment Requirement by the end of the Investment Period, this Fee Agreement shall terminate. In such event, the Company shall pay the County an amount pursuant to the Act which is equal to the excess, if any, of (*i*) the total amount of *ad valorem* taxes as would result from taxes levied on the Project by the County, municipality or municipalities, school district or school districts, and other political units as if the items of property comprising the Economic Development Property were not Economic Development Property, but with appropriate reductions equivalent to all tax exemptions and abatements to which the Company would be entitled in such a case, through and including the end of the Investment Period, over (*ii*) the total amount of FILOT payments the Company has made with respect to the Economic Development Property through and including the end of the Investment Period. Any amounts determined to be owing pursuant to the foregoing sentence shall be subject to the minimum amount of interest that the Act may require.

(b) In the event that the cost of the Project (without regard to depreciation and taking into account any Sponsor Affiliate investments), does not reach the Contract Minimum Investment Requirement by the end of the Investment Period, the Infrastructure Credit shall be adjusted prospectively, so that the amount of the Fixed FILOT Payment is increased by a percentage equal to the percentage of the shortfall. By way of example, if the Sponsor invests $49,500,000 in the Project, the Sponsor's investment falls 10% short of the Contact Minimum Investment Requirement of $55,000,000. As a result, the Fixed FILOT Payment therefore increases prospectively by 10% (i.e. by $360) to $3,960 per MWac. Notwithstanding section 4.6, hereof, any reduction in the cost of the Project following the end of the Investment Period shall not act to reduce the Fixed FILOT Payment due, as calculated hereunder.

## ARTICLE VII
## DEFAULT

**Section 7.1.** *Events of Default.* Subject in all events to Section 10.9 hereof, the following are "Events of Default" under this Fee Agreement:

(a) Failure by the Sponsor to make FILOT Payments due under this Agreement, which failure has not been cured within 30 days following receipt of written notice from the County specifying the delinquency in FILOT Payments and requesting that it be remedied;

9

(b) (i) A material representation or warranty made by the Sponsor is materially incorrect when made or deemed made; or (ii) a failure by the Sponsor to perform any of the material terms, conditions, obligations, or covenants under this Fee Agreement (other than those under (a), above), which failure under (i) or (ii) has not been cured within 30 days after written notice from the County to the Sponsor specifying such failure and requesting that it be remedied, unless the Sponsor has instituted corrective action within the 30-day period and is diligently pursuing corrective action until the default is corrected, in which case the 30-day period is extended to include the period during which the Sponsor is diligently pursuing corrective action;

(c) A material representation or warranty made by the County which is materially incorrect when made or deemed made; or

(d) Failure by the County to perform any of the material terms, conditions, obligations, or covenants hereunder, which failure has not been cured within 30 days after written notice from the Sponsor to the County specifying such failure and requesting that it be remedied, unless the County has instituted corrective action within the 30-day period and is diligently pursuing corrective action until the default is corrected, in which case the 30-day period is extended to include the period during which the County is diligently pursuing corrective action.

Section 7.2. *Remedies on Default.*

(a) If an Event of Default by the Sponsor has occurred and is continuing, then the County may take any one or more of the following remedial actions:

(i) bring an action for collection of any amounts due hereunder; and/or terminate this Fee Agreement, upon another 30 days written notice, in the case of an Event of Default under Section 7.1(a); or

(ii) take whatever action at law or in equity that may appear necessary or desirable to remedy the Event of Default under Section 7.1(b) but the County's damages under this Agreement for an Event of Default shall always be limited to and never exceed under any circumstance the amount of FILOT Payments due (after application of any Infrastructure Credit) plus legal fees and expenses under Section 7.3 hereof, and any penalty and interest required by statute. Under no circumstances will the Sponsor ever be liable to the County for any other damages hereunder or any other penalty or other interest.

(b) If an Event of Default by the County has occurred and is continuing, the Sponsor may take any one or more of the following actions:

(i) bring an action for specific enforcement;

(ii) terminate this Fee Agreement; or

(iii) take such other action as is appropriate, including legal action, to recover its damages, to the extent allowed by law. For purposes of this Agreement, the Sponsor and any Sponsor Affiliate's damages under this Agreement for an Event of Default shall be limited to and never exceed, under any circumstance, the savings to be realized by the Sponsor and/or the Sponsor Affiliate as a result of the FILOT Payments and Infrastructure Credit provided herein, plus any legal fees and expenses under Section 7.3 hereof, plus interest at the same rate as provided under (a)(ii) above. Under no circumstances will the County ever be liable for any other damages hereunder or penalty or other interest.

Section 7.3. *Legal Fees and Other Expenses.* Except as provided in Section 7.2 above, each party shall bear its own costs, including attorneys' fees, incurred in enforcing any provision of this Agreement.

10

4899-8507-2960 v.6

Section 7.4. *Remedies Not Exclusive.* Unless expressly provided otherwise, no remedy described in this Fee Agreement is intended to be exclusive of any other remedy or remedies described in this Agreement, and each and every such remedy is cumulative and in addition to every other remedy given under this Fee Agreement.

## ARTICLE VIII
## PARTICULAR RIGHTS AND COVENANTS

Section 8.1. *Right to Inspect.* Subject to the Sponsor's safety policies and requirements, this Agreement does not limit any otherwise existing legal right of the County and its authorized agents, at any reasonable time on prior notice, to enter and examine and inspect the Project for the purposes of permitting the County to carry out its duties and obligations in its sovereign capacity (such as, without limitation, for such routine health and safety purposes as would be applied to any other manufacturing or commercial facility in the County).

Section 8.2. *Confidentiality.* The County acknowledges that the Sponsor may utilize confidential and proprietary processes and materials, services, equipment, trade secrets, and techniques ("Confidential Information") and that disclosure of the Confidential Information could result in substantial economic harm to the Sponsor. The Sponsor may clearly label any Confidential Information delivered to the County pursuant to this Fee Agreement as "*Confidential Information.*" Except as required by law, the County, or any employee, agent, or contractor of the County, shall not disclose or otherwise divulge any labeled Confidential Information to any other person, firm, governmental body or agency. The Sponsor acknowledges that the County is subject to the South Carolina Freedom of Information Act, and, as a result, must disclose certain documents and information on request, absent an exemption. If the County is required to disclose any Confidential Information to a third party, the County will use its best efforts to provide the Sponsor with as much advance notice as is reasonably possible of such disclosure requirement prior to making such disclosure, and to cooperate reasonably with any attempts by the Sponsor to obtain judicial or other relief from such disclosure requirement.

Section 8.3. *No Liability of County Personnel.* All covenants, stipulations, promises, agreements and obligations of the County contained in this Fee Agreement are binding on members of the County Council or any elected official, officer, agent, servant or employee of the County only in his or her official capacity and not in his or her individual capacity, and no recourse for the payment of any moneys under this Fee Agreement may be had against any member of County Council or any elected or appointed official, officer, agent, servant or employee of the County and no recourse for the payment of any moneys or performance of any of the covenants and agreements under this Fee Agreement or for any claims based on this Fee Agreement may be had against any member of County Council or any elected or appointed official, officer, agent, servant or employee of the County except solely in their official capacity.

Section 8.4. *Assignment.* The Sponsor may assign this Fee Agreement in whole or in part with the prior written consent of the County or a subsequent written ratification by the County, which may be done by resolution, and which consent or ratification the County will not unreasonably withhold; provided, however, that the County hereby expressly consents in advance to any such assignment of this Fee Agreement, in whole or in part, by the Sponsor to any entity, now existing or to be formed in the future, which controls, is controlled by, or is under common control with, the Sponsor. The Sponsor agrees to notify the County and the Department of the identity of the proposed transferee within 60 days of the transfer. In case of a transfer, the transferee assumes the transferor's basis in the Economic Development Property for purposes of calculating the FILOT Payments.

Section 8.5. *No Double Payment; Future Changes in Legislation.* Notwithstanding anything contained in this Fee Agreement to the contrary, and except as expressly required by law, the Sponsor is not required to make a FILOT Payment in addition to a regular *ad valorem* property tax payment in the same year with respect to the same piece of Economic Development Property. The Sponsor is not required to make a

11

FILOT Payment on Economic Development Property in cases where, absent this Fee Agreement, *ad valorem* property taxes would otherwise not be due on such property.

Section 8.6. *Administration Expenses.* The Sponsor will reimburse the County for its Administration Expenses in an amount that shall in any event be capped at and limited in the aggregate to $7,500 on receipt of a written request from the County or at the County's direction, which request shall include a statement of the amount of the Administration Expense. The Sponsor shall pay the Administration Expense as set forth in the written request no later than 60 days following receipt of the written request from the County. The County does not impose a charge in the nature of impact fees or recurring fees in connection with the incentives authorized by this Fee Agreement. The payment by the Sponsor of the County's Administration Expenses shall not be construed as prohibiting the County from engaging, at its discretion, the counsel of the County's choice.

Section 8.7. *Multicounty Park.* By December 31, 2025, the County will cause the Real Property to be placed in the Multicounty Park (if not already in the Multicounty Park) and to maintain the Real Property in the Multicounty Park or in some other multicounty industrial or business park within the meaning of the MCIP Act for at least as long as the Infrastructure Credit is to be provided to the Sponsor under this Fee Agreement.

Section 8.8. *Limitation of Liability.* The County is not liable to the Sponsor for any costs, expenses, losses, damages, claims or actions in connection with this Fee Agreement, except from amounts received by the County from the Sponsor under this Fee Agreement. Notwithstanding anything in this Fee Agreement to the contrary, any financial obligation the County may incur under this Fee Agreement is deemed not to constitute a pecuniary liability or a debt or general obligation of the County.

Section 8.9. *Indemnification.*

(a)    Except as provided in paragraph (d) below, the Sponsor shall indemnify and save the County, its employees, elected officials, officers and agents (each, an *"Indemnification Party"*) harmless against and from all liability or claims arising from the County's execution of this Fee Agreement, performance of the County's obligations under this Fee Agreement or the administration of its duties pursuant to this Fee Agreement, or otherwise by virtue of the County having entered into this Fee Agreement, except for claims by the Sponsor. In all events, the Sponsor's obligation to indemnify any Indemnification Party under this Section 8.9 shall be limited to an amount equal to such benefits and incentives the Sponsor has realized under this Fee Agreement.

(b)  The County is entitled to use counsel of its choice and the Sponsor shall reimburse the County for all of its reasonable costs, including attorneys' fees, incurred in connection with the response to or defense against such liability or claims as described in paragraph (a), above. The County shall provide a statement of the costs incurred in the response or defense that includes an itemized list of tasks performed for the County and the associated time spent on each task, and the Sponsor shall pay the County within 90 days of receipt of the statement. The Sponsor may request further reasonable documentation evidencing the costs shown on the statement. However, the County is not required to provide any documentation which may be privileged or confidential to evidence the costs.

(c)  The County may request the Sponsor to resist or defend against any claim on behalf of an Indemnified Party. On such request, the Sponsor shall resist or defend against such claim on behalf of the Indemnified Party, at the Sponsor's expense. The Sponsor is entitled to use counsel of its choice, manage and control the defense of or response to such claim for the Indemnification Party; provided the Sponsor is not entitled to settle any such claim without the consent of that Indemnification Party.

(d)  Notwithstanding anything in this Section or this Fee Agreement to the contrary, the Sponsor is not required to indemnify any Indemnification Party against or reimburse the County for costs arising from any claim or liability as required under this Section or this Fee Agreement (i) occasioned by the acts of that Indemnification Party, which are unrelated to the execution of this Fee Agreement, performance of the

12

4899-8507-2960 v.6

County's obligations under this Fee Agreement, or the administration of its duties under this Fee Agreement, or otherwise by virtue of the County having entered into this Fee Agreement; (ii) resulting from that Indemnification Party's own negligence, bad faith, fraud, deceit, or willful misconduct; or (iii) if, upon receiving notice from the County of the County's intent to respond to or defend against a liability or claim, Sponsor requests the County not to respond to or defend against such liability or claim and Sponsor terminates this Fee Agreement pursuant to Section 10.10(b) herein with respect to all of the Project, but only to the extent such asserted liability or claim will be completely extinguished by the Sponsor's termination of this Fee Agreement.

(e)  An Indemnification Party may not avail itself of the indemnification or reimbursement of costs provided in this Section unless it provides the Sponsor with prompt, written notice of the existence or threat of any claim or liability, including, without limitation, copies of any citations, orders, fines, charges, remediation requests, or other claims or threats of claims, in order to afford the Sponsor notice, reasonable under the circumstances, within which to defend or otherwise respond to a claim. In no event shall the Sponsor be required to indemnify or reimburse an Indemnification Party under this Section if the Indemnification Party does not provide Sponsor with written notice of the existence or threat of any claim or liability within 30 days of such claim or liability arising.

(f)  The Sponsor's liability under this section shall not exceed an amount of $300,000.

## ARTICLE IX
## SPONSOR AFFILIATES

**Section 9.1.  *Sponsor Affiliates.*** The Sponsor may designate Sponsor Affiliates from time to time, including at the time of execution of this Fee Agreement, pursuant to and subject to the provisions of Section 12-44-130 of the Act. To designate a Sponsor Affiliate, the Sponsor must deliver written notice to the County identifying the Sponsor Affiliate. The County hereby expressly consents to any designation by the Sponsor as a Sponsor Affiliate (i) any entity, now existing or to be formed in the future, which controls, is controlled by, or is under common control with, the Sponsor, (ii) any third party that the Sponsor may elect to involve in the investment in and ownership or financing of the Project, and (iii) the landowner(s) of the Real Property. The Sponsor Affiliate's joining in the investment at the Project will be effective on delivery of a Joinder Agreement, the form of which is attached as Exhibit B, executed by the Sponsor Affiliate to the County.

**Section 9.2.  *Primary Responsibility.*** Notwithstanding the addition of a Sponsor Affiliate, the Sponsor acknowledges that it has the primary responsibility for the duties and obligations of the Sponsor and any Sponsor Affiliate under this Fee Agreement, including the payment of FILOT Payments or any other amount due to or for the benefit of the County under this Fee Agreement, arising and due as a result of the Project. For purposes of this Fee Agreement, "primary responsibility" means that if the Sponsor Affiliate fails to make any FILOT Payment or remit any other amount due under this Fee Agreement, the Sponsor shall make such FILOT Payments or remit such other amounts on behalf of the Sponsor Affiliate. The Sponsor Affiliate's secondary obligation to make FILOT Payments under this Fee Agreement to the County shall be limited to the FILOT Payments due on the Sponsor Affiliate's Economic Development Property only and under no circumstances shall the Sponsor Affiliate be liable for any FILOT Payments relating to the Sponsor's Economic Development Property.

## ARTICLE X
## MISCELLANEOUS

**Section 10.1.  *Notices.*** Any notice, election, demand, request, or other communication to be provided under this Fee Agreement is effective when delivered to the party named below or when deposited with the United States Postal Service, certified mail, return receipt requested, postage prepaid, addressed as follows (or addressed to such other address as any party shall have previously furnished in writing to the other party),

13

4899-8507-2960 v.6

except where the terms of this Fee Agreement require receipt rather than sending of any notice, in which case such provision shall control:

### IF TO THE SPONSOR:

SR Georgetown, LLC
Attn: Luke Wilkinson
222 Second Ave S. Suite 1900
Nashville, TN 37201

### WITH A COPY TO (does not constitute notice):

Nelson Mullins Riley & Scarborough, LLP
Attn: Edward Kluiters
1320 Main Street, 17th Floor
Columbia, SC 29201

### IF TO THE COUNTY:

Georgetown County, South Carolina
Attn: County Administrator
716 Prince Street
Georgetown, South Carolina 29440

### WITH A COPY TO (does not constitute notice):

King Kozlarek Root Law LLC
Attn: Michael E. Kozlarek
Post Office Box 565
Greenville, South Carolina 29602-0565

**Section 10.2. *Provisions of Agreement for Sole Benefit of County and Sponsor.*** Except as otherwise specifically provided in this Fee Agreement, nothing in this Fee Agreement expressed or implied confers on any person or entity other than the County and the Sponsor and any Sponsor Affiliates any right, remedy, or claim under or by reason of this Fee Agreement, this Fee Agreement being intended to be for the sole and exclusive benefit of the County and the Sponsor and any Sponsor Affiliates.

**Section 10.3. *Counterparts.*** This Fee Agreement may be executed in any number of counterparts, and all of the counterparts together constitute one and the same instrument.

**Section 10.4. *Governing Law.*** South Carolina law, exclusive of its conflicts of law provisions that would refer the governance of this Fee Agreement to the laws of another jurisdiction, governs this Fee Agreement and all documents executed in connection with this Fee Agreement.

**Section 10.5. *Headings.*** The headings of the articles and sections of this Fee Agreement are inserted for convenience only and do not constitute a part of this Fee Agreement.

**Section 10.6. *Amendments.*** This Fee Agreement may be amended only by written agreement of the parties to this Fee Agreement.

**Section 10.7. *Agreement to Sign Other Documents.*** From time to time, and at the expense of the Sponsor, to the extent any expense is incurred, the County agrees to execute and deliver to the Sponsor such additional instruments as the Sponsor may reasonably request and as are authorized by law and reasonably within the purposes and scope of the Act and this Fee Agreement to effectuate the purposes of this Fee Agreement.

14

4899-8507-2960 v.6

Section 10.8. *Interpretation; Invalidity; Change in Laws.*

(a) If the inclusion of property as Economic Development Property or any other issue is unclear under this Fee Agreement, then the parties intend that the interpretation of this Fee Agreement be done in a manner that provides for the broadest inclusion of property under the terms of this Fee Agreement and the maximum incentive permissible under the Act, to the extent not inconsistent with any of the explicit terms of this Fee Agreement. It is expressly agreed that the Sponsor may add Economic Development Property, whether real or personal, by including such property on the Sponsor's PT-300 Schedule S or successor form during the Investment Period to the fullest extent permitted by law.

(b) If any provision of this Fee Agreement is declared illegal, invalid, or unenforceable for any reason, the remaining provisions of this Fee Agreement are unimpaired, and the parties shall reform such illegal, invalid, or unenforceable provision to effectuate most closely the legal, valid, and enforceable intent of this Fee Agreement so as to afford the Sponsor with the maximum benefits to be derived under this Fee Agreement, it being the intention of the County to offer the Sponsor the strongest inducement possible, within the provisions of the Act, to locate the Project in the County.

(c) The County agrees that in case the FILOT incentive described in this Fee Agreement is found to be invalid and the Sponsor does not realize the economic benefit it is intended to receive from the County under this Fee Agreement as an inducement to locate in the County, the County agrees to provide a special source revenue or Infrastructure Credit to the Sponsor (in addition to the Infrastructure Credit explicitly provided for above) to the maximum extent permitted by law, to allow the Sponsor to recoup all or a portion of the loss of the economic benefit resulting from such invalidity.

Section 10.9. *Force Majeure.* Notwithstanding Section 7.1 hereof or any other provision of this Fee Agreement to the contrary, the Sponsor is not liable or responsible for any delays or non-performance caused in whole or in part, directly or indirectly, by strikes, accidents, freight embargoes, fires, floods, inability to obtain materials, conditions arising from governmental orders or regulations, war or national emergency, acts of God, natural disasters, and any other cause, similar or dissimilar, beyond the Sponsor's reasonable control.

Section 10.10. *Termination; Termination by Sponsor.*

(a) Unless first terminated under any other provision of this Fee Agreement, this Fee Agreement terminates on the Final Termination Date.

(b) The Sponsor is authorized to terminate this Fee Agreement at any time with respect to all or part of the Project on providing the County with 30 days' notice.

(c) Any monetary obligations due and owing at the time of termination and any provisions which are intended to survive termination, survive such termination.

(d) In the year following termination, all Economic Development Property is subject to *ad valorem* taxation or such other taxation or payment in lieu of taxation that would apply absent this Fee Agreement. The Sponsor's obligation to make FILOT Payments under this Fee Agreement terminates to the extent of and in the year following the year the Sponsor terminates this Fee Agreement pursuant to this Section.

Section 10.11. *Entire Agreement.* This Fee Agreement expresses the entire understanding and all agreements of the parties, and neither party is bound by any agreement or any representation to the other party which is not expressly set forth in this Fee Agreement or in certificates delivered in connection with the execution and delivery of this Fee Agreement.

Section 10.12. *Waiver.* Either party may waive compliance by the other party with any term or condition of this Fee Agreement only in a writing signed by the waiving party.

15

4899-8507-2960 v.6

Section 10.13. *Business Day.* If any action, payment, or notice is, by the terms of this Fee Agreement, required to be taken, made, or given on any Saturday, Sunday, or legal holiday in the jurisdiction in which the party obligated to act is situated, such action, payment, or notice may be taken, made, or given on the following business day with the same effect as if taken, made or given as required under this Fee Agreement, and no interest will accrue in the interim.

Section 10.14. *Agreement's Construction.* Each party and its counsel have reviewed this Fee Agreement and any rule of construction to the effect that ambiguities are to be resolved against a drafting party does not apply in the interpretation of this Fee Agreement or any amendments or exhibits to this Fee Agreement.

*[Signature pages follow]*

16

**IN WITNESS WHEREOF,** the County, acting by and through the County Council, has caused this Fee Agreement to be executed in its name and on its behalf by the Chair of County Council and to be attested by the Clerk of the County Council; and the Sponsor has caused this Fee Agreement to be executed by its duly authorized officer, all as of the day and year first above written.

**GEORGETOWN COUNTY, SOUTH CAROLINA**

(SEAL)

By:_____

County Council Chair
Georgetown County, South Carolina

**ATTEST:**

By: _____

Clerk to County Council
Georgetown County, South Carolina

*[Signature Page 1 to Fee in Lieu of Ad Valorem Taxes Agreement]*

Signature Page-1

4899-8507-2960 v.6

**SR GEORGETOWN, LLC**

By: _____
Name: Reagan D. Farr
Title: President

**SILICON RANCH CORPORATION**

By: _____
Name: Reagan D Farr
Title: Chief Executive Officer

*[Signature Page 2 to Fee in Lieu of Ad Valorem Taxes Agreement]*

Signature Page-2

4899-8507-2960 v.6

# EXHIBIT A
## PROPERTY DESCRIPTION

## Georgetown Project Legal Description (all land):

SITUATED AND LYING IN THE STATE OF SOUTH CAROLINA, GEORGETOWN COUNTY, BEING MORE PARTICULARLY BOUNDED AND DESCRIBED AS FOLLOWS:

COMMENCING FROM A POINT, BEING THE INTERSECTION OF SAINTS DELIGHT ROAD AND WILD HORSE ROAD, THENCE SOUTH 09° 43' 59" WEST A DISTANCE OF 945.24' TO A SET 5/8" REBAR,  SAID POINT BEING THE POINT OF BEGINNING.

THENCE SOUTH 29°58'45" EAST, A DISTANCE OF 96.45 FEET TO A CALCULATED POINT;
THENCE SOUTH 34°56'55" EAST, A DISTANCE OF 237.49 FEET TO A CALCULATED POINT;
THENCE SOUTH 01°15'21" EAST, A DISTANCE OF 64.42 FEET TO A CONCRETE MONUMENT;
THENCE SOUTH 81°23'51" EAST, A DISTANCE OF 66.79 FEET TO A CALCULATED POINT;
THENCE SOUTH 47°16'24" EAST, A DISTANCE OF 451.28 FEET TO A CALCULATED POINT;
THENCE SOUTH 46°37'38" EAST, A DISTANCE OF 249.00 FEET TO A CALCULATED POINT;
THENCE SOUTH 38°00'32" EAST, A DISTANCE OF 259.47 FEET TO A CALCULATED POINT;
THENCE SOUTH 43°23'11" EAST, A DISTANCE OF 279.65 FEET TO A CONCRETE MONUMENT;
THENCE SOUTH 03°01'51" WEST, A DISTANCE OF 1,175.99 FEET TO A CONCRETE MONUMENT;
THENCE NORTH 75°12'59" WEST, A DISTANCE OF 238.22 FEET TO A CONCRETE MONUMENT;
THENCE SOUTH 81°55'18" WEST, A DISTANCE OF 362.34 FEET TO A 1/2" IRON PIPE FOUND;
THENCE SOUTH 07°26'25" WEST, A DISTANCE OF 378.49 FEET TO A CONCRETE MONUMENT;
THENCE SOUTH 78°10'05" EAST, A DISTANCE OF 316.49 FEET TO A CONCRETE MONUMENT;
THENCE SOUTH 57°01'55" EAST, A DISTANCE OF 316.60 FEET TO A CONCRETE MONUMENT;
THENCE SOUTH 73°04'14" EAST, A DISTANCE OF 226.59 FEET TO A CONCRETE MONUMENT;
THENCE NORTH 48°19'08" EAST, A DISTANCE OF 502.76 FEET TO A 1/2" IRON PIPE FOUND DISTURBED;
THENCE SOUTH 66°13'09" EAST, A DISTANCE OF 942.05 FEET TO A 1" IRON REBAR FOUND;
THENCE SOUTH 32°54'49" EAST, A DISTANCE OF 376.84 FEET TO A 1/2" IRON PIPE FOUND;
THENCE SOUTH 27°05'18" EAST, A DISTANCE OF 211.71 FEET TO A 1 1/4" IRON PIPE FOUND DISTURBED;
THENCE SOUTH 01°37'39" EAST, A DISTANCE OF 363.28 FEET TO A CONCRETE MONUMENT;
THENCE SOUTH 25°35'20" WEST, A DISTANCE OF 339.93 FEET TO A CONCRETE MONUMENT;
THENCE SOUTH 59°32'30" EAST, A DISTANCE OF 361.30 FEET TO A 1" IRON REBAR FOUND;
THENCE SOUTH 58°18'33" EAST, A DISTANCE OF 73.67 FEET TO A CALCULATED POINT;
THENCE SOUTH 13°12'22" EAST, A DISTANCE OF 156.97 FEET TO A CALCULATED POINT;
THENCE SOUTH 04°28'34" WEST, A DISTANCE OF 249.61 FEET TO A 1" REBAR FOUND;
THENCE SOUTH 01°36'09" WEST, A DISTANCE OF 455.03 FEET TO A 1" REBAR FOUND;
THENCE SOUTH 03°25'35" EAST, A DISTANCE OF 742.26 FEET TO A CONCRETE MONUMENT FOUND;
THENCE SOUTH 69°41'44" EAST, A DISTANCE OF 736.35 FEET TO A CONCRETE MONUMENT FOUND;
THENCE NORTH 86°17'57" EAST, A DISTANCE OF 426.60 FEET TO A SET 5/8" REBAR WITH CAP;
THENCE NORTH 08°19'54" WEST, A DISTANCE OF 792.16 FEET TO A CONCRETE MONUMENT FOUND;
THENCE NORTH 30°22'27" EAST, A DISTANCE OF 759.28 FEET TO A SET 5/8" REBAR WITH CAP;
THENCE NORTH 67°01'49" EAST, A DISTANCE OF 1,300.35 FEET TO A SET 5/8" REBAR WITH CAP;
THENCE SOUTHEASTWARDLY, WITH THE ARC OF A CURVE TO THE RIGHT HAVING A RADIUS OF 737.54 FEET, A CENTRAL ANGLE OF 40°31'54" AND A CHORD THAT BEARS SOUTH 89°15'23" EAST, A CHORD DISTANCE OF 510.93 FEET TO A SET 5/8" REBAR WITH CAP;

THENCE SOUTH 56°30'56" EAST, A DISTANCE OF 540.95 FEET TO A SET 5/8" REBAR WITH CAP;
THENCE SOUTH 51°02'37" EAST, A DISTANCE OF 453.57 FEET TO A 3/4" IRON PIPE FOUND;
THENCE SOUTH 55°59'55" EAST, A DISTANCE OF 122.21 FEET TO A 1" IRON PIPE FOUND;
THENCE SOUTH 25°52'35" WEST, A DISTANCE OF 645.19 FEET TO A CALCULATED POINT;
THENCE SOUTH 25°52'35" WEST, A DISTANCE OF 205.19 FEET TO A 1" CRIMPED IRON PIPE FOUND;
THENCE SOUTH 25°43'23" WEST, A DISTANCE OF 197.74 FEET TO A 1" IRON PIPE FOUND DISTURBED;
THENCE SOUTH 22°14'28" WEST, A DISTANCE OF 171.83 FEET TO AN AXLE FOUND;
THENCE SOUTH 22°31'33" WEST, A DISTANCE OF 44.76 FEET TO A 1" IRON PIPE FOUND;
THENCE SOUTH 02°05'03" WEST, A DISTANCE OF 9.65 FEET TO A 1" IRON PIPE FOUND;
THENCE SOUTH 29°23'49" WEST, A DISTANCE OF 117.74 FEET TO A 1" IRON REBAR FOUND;
THENCE SOUTH 20°07'44" WEST, A DISTANCE OF 64.96 FEET TO A 1" IRON REBAR FOUND;
THENCE SOUTH 24°53'44" WEST, A DISTANCE OF 108.44 FEET TO A 1" IRON REBAR FOUND;
THENCE SOUTH 24°47'22" WEST, A DISTANCE OF 101.20 FEET TO A 1/2" IRON PIPE FOUND;
THENCE SOUTH 24°27'13" WEST, A DISTANCE OF 182.82 FEET TO AN AXLE FOUND;
THENCE SOUTH 24°49'05" WEST, A DISTANCE OF 255.62 FEET TO A 1" CRIMPED IRON PIPE FOUND DISTURBED;
THENCE SOUTH 23°50'12" WEST, A DISTANCE OF 58.35 FEET TO A 1/2" IRON PIPE FOUND;
THENCE SOUTH 22°59'43" WEST, A DISTANCE OF 397.46 FEET TO A 1" IRON PIPE FOUND;
THENCE SOUTH 26°15'02" WEST, A DISTANCE OF 105.41 FEET TO A CONCRETE MONUMENT DISTURBED;
THENCE SOUTH 83°11'36" WEST, A DISTANCE OF 216.19 FEET TO A CONCRETE MONUMENT DISTURBED;
THENCE NORTH 69°00'22" WEST, A DISTANCE OF 696.61 FEET TO A CONCRETE MONUMENT DISTURBED;
THENCE NORTH 19°33'06" EAST, A DISTANCE OF 39.90 FEET TO A CONCRETE MONUMENT;
THENCE NORTH 87°04'13" WEST, A DISTANCE OF 2,102.95 FEET TO AN AXLE FOUND;
THENCE SOUTH 01°45'27" EAST, A DISTANCE OF 127.00 FEET TO A CALCULATED POINT;
THENCE SOUTH 02°00'27" EAST, A DISTANCE OF 287.00 FEET TO A SET 5/8" REBAR WITH CAP;
THENCE SOUTH 37°00'27" EAST, A DISTANCE OF 146.00 FEET TO A SET 5/8" REBAR WITH CAP;
THENCE SOUTH 23°44'31" EAST, A DISTANCE OF 202.55 FEET TO A CALCULATED POINT;
THENCE SOUTH 10°45'27" EAST, A DISTANCE OF 157.00 FEET TO A SET 5/8" REBAR WITH CAP;
THENCE SOUTH 24°00'27" EAST, A DISTANCE OF 256.00 FEET TO AN AXLE FOUND;
THENCE SOUTH 21°50'05" EAST, A DISTANCE OF 30.00 FEET TO A CALCULATED POINT;
THENCE SOUTH 28°40'05" EAST, A DISTANCE OF 179.00 FEET TO A SET 5/8" REBAR WITH CAP;
THENCE SOUTH 18°20'05" EAST, A DISTANCE OF 112.00 FEET TO A SET 5/8" REBAR WITH CAP;
THENCE SOUTH 00°44'55" WEST, A DISTANCE OF 192.00 FEET TO A SET 5/8" REBAR WITH CAP;
THENCE SOUTH 09°30'33" EAST, A DISTANCE OF 185.55 FEET TO A CONCRETE MONUMENT FOUND;
THENCE SOUTH 83°02'03" EAST, A DISTANCE OF 201.02 FEET TO A CONCRETE MONUMENT FOUND;
THENCE SOUTH 07°16'36" EAST, A DISTANCE OF 426.26 FEET TO A SET 5/8" REBAR WITH CAP;
THENCE SOUTH 13°13'31" EAST, A DISTANCE OF 365.86 FEET TO A 1 1/4" IRON PIPE FOUND;
THENCE SOUTH 71°21'36" WEST, A DISTANCE OF 1,161.03 FEET TO A SET 5/8' REBAR WITH CAP;
THENCE SOUTHWESTWARDLY, WITH THE ARC OF A CURVE TO THE LEFT HAVING A RADIUS OF 1,070.41 FEET, A CENTRAL ANGLE OF 36°46'01" AND A CHORD THAT BEARS SOUTH 51°19'37" WEST, A CHORD DISTANCE OF 675.16 FEET TO A SET 5/8" REBAR WITH CAP;

4899-8507-2960 v.6

THENCE SOUTH 33°18'13" WEST, A DISTANCE OF 1,262.43 FEET TO A SET 5/8" REBAR WITH CAP;

THENCE NORTH 09°35'03" WEST, A DISTANCE OF 1,487.90 FEET TO A CONCRETE MONUMENT FOUND;

THENCE NORTH 38°42'16" EAST, A DISTANCE OF 40.05 FEET TO A CALCULATED POINT;

THENCE NORTH 38°42'16" EAST, A DISTANCE OF 89.05 FEET TO A 5/8" REBAR FOUND;

THENCE NORTH 19°12'03" WEST, A DISTANCE OF 1,540.29 FEET TO A 5/8" REBAR FOUND DISTURBED;

THENCE NORTH 60°32'54" WEST, A DISTANCE OF 1,604.07 FEET TO A 5/8" REBAR FOUND;

THENCE SOUTH 71°27'03" WEST, A DISTANCE OF 2,667.73 FEET TO A CONCRETE MONUMENT;

THENCE NORTH 24°31'19" EAST, A DISTANCE OF 368.24 FEET TO A SET 5/8" REBAR WITH CAP;

THENCE NORTH 75°24'46" WEST, A DISTANCE OF 526.24 FEET TO A SET 5/8" REBAR WITH CAP;

THENCE NORTH 35°22'01" EAST, A DISTANCE OF 290.43 FEET TO A SET 5/8" REBAR WITH CAP;

THENCE NORTH 29°16'22" EAST, A DISTANCE OF 186.38 FEET TO A SET 5/8" REBAR WITH CAP;

THENCE NORTH 24°24'00" EAST, A DISTANCE OF 480.19 FEET TO A SET 5/8" REBAR WITH CAP;

THENCE NORTH 28°18'57" EAST, A DISTANCE OF 578.75 FEET TO A SET 5/8" REBAR WITH CAP;

THENCE NORTH 25°19'29" EAST, A DISTANCE OF 240.80 FEET TO A SET 5/8" REBAR WITH CAP;

THENCE NORTH 15°34'01" EAST, A DISTANCE OF 96.46 FEET TO A SET 5/8" REBAR WITH CAP;

THENCE NORTH 08°19'19" EAST, A DISTANCE OF 319.59 FEET TO A SET 5/8" REBAR WITH CAP;

THENCE NORTH 06°09'04" EAST, A DISTANCE OF 525.71 FEET TO A SET 5/8" REBAR WITH CAP;

THENCE NORTHEASTWARDLY, WITH THE ARC OF A CURVE TO THE RIGHT HAVING A RADIUS OF 367.63 FEET, A CENTRAL ANGLE OF 22°42'54" AND A CHORD THAT BEARS NORTH 22°54'32" EAST, A CHORD DISTANCE OF 144.80 FEET TO A SET 5/8" REBAR WITH CAP;

THENCE NORTH 30°09'50" EAST, A DISTANCE OF 540.00 FEET TO A SET 5/8" REBAR WITH CAP;

THENCE NORTH 25°42'18" EAST, A DISTANCE OF 860.23 FEET TO A SET 5/8" REBAR WITH CAP;

THENCE NORTHEASTWARDLY, WITH THE ARC OF A CURVE TO THE RIGHT HAVING A RADIUS OF 4,639.57 FEET, A CENTRAL ANGLE OF 16°12'09" AND A CHORD THAT BEARS NORTH 37°25'12" EAST, A CHORD DISTANCE OF 1,307.63 FEET TO A SET 5/8" REBAR WITH CAP;

THENCE NORTH 24°13'30" EAST, A DISTANCE OF 1,560.33 FEET TO A SET 5/8" REBAR WITH CAP;

THENCE NORTH 16°41'43" EAST, A DISTANCE OF 136.54 FEET TO A SET 5/8" REBAR WITH CAP;

THENCE NORTH 02°02'06" EAST, A DISTANCE OF 322.31 FEET TO A SET 5/8" REBAR WITH CAP;

THENCE NORTH 00°25'01" EAST, A DISTANCE OF 345.78 FEET TO A SET 5/8" REBAR WITH CAP;

THENCE NORTHEASTWARDLY, WITH THE ARC OF A CURVE TO THE RIGHT HAVING A RADIUS OF 833.21 FEET, A CENTRAL ANGLE OF 27°34'41" AND A CHORD THAT BEARS NORTH 10°31'06" EAST, A CHORD DISTANCE OF 397.19 FEET TO A SET 5/8" REBAR WITH CAP;

THENCE NORTH 26°49'43" EAST, A DISTANCE OF 404.42 FEET TO A SET 5/8" REBAR WITH CAP;

THENCE NORTHEASTWARDLY, WITH THE ARC OF A CURVE TO THE LEFT HAVING A RADIUS OF 1,641.00 FEET, A CENTRAL ANGLE OF 07°59'10" AND A CHORD THAT BEARS NORTH 22°27'21" EAST, A CHORD DISTANCE OF 228.55 FEET TO A SET 5/8" REBAR WITH CAP. SAID POINT BEING THE POINT OF BEGINNING.

CONTAINING 1,003.79 ACRES OF LAND, MORE OR LESS.

4899-8507-2960 v.6

## EXHIBIT B

### FORM OF JOINDER AGREEMENT

### JOINDER AGREEMENT

This Joinder Agreement dated _____ is by and between Georgetown County, South Carolina ("County") and [joinder party name] as Sponsor Affiliate ("Sponsor Affiliate").

Reference is hereby made to the Fee-in-Lieu of *Ad Valorem* Taxes and Infrastructure Credit Agreement, effective _____, 2025 ("Fee Agreement"), between the County, SR Georgetown, LLC ("Sponsor"), and Silicon Ranch Corporation.

1.     **Joinder to Fee Agreement.**

Sponsor Affiliate, a Delaware Corporation authorized to conduct business in the State of South Carolina, hereby (a) joins as a party to, and agrees to be bound by and subject to all of the terms and conditions of, the Fee Agreement applicable to Sponsor Affiliates; (b) shall receive the benefits as provided under the Fee Agreement with respect to the Economic Development Property placed in service by the Sponsor Affiliate as if it were a Sponsor; (c) acknowledges and agrees that (i) according to the Fee Agreement, the undersigned has been designated as a Sponsor Affiliate by the Sponsor for purposes of the Project; and (ii) the undersigned qualifies or will qualify as a Sponsor Affiliate under the Fee Agreement and Section 12-44-30(20) and Section 12-44-130 of the Act.

2.     **Capitalized Terms.**

Each capitalized term used, but not defined, in this Joinder Agreement has the meaning of that term set forth in the Fee Agreement.

3.     **Representations of the Sponsor Affiliate.**

The Sponsor Affiliate represents and warrants to the County as follows:

(a) The Sponsor Affiliate is in good standing under the laws of the state of its organization, is duly authorized to transact business in the State (or will obtain such authority prior to commencing business in the State), has power to enter into this Joinder Agreement, and has duly authorized the execution and delivery of this Joinder Agreement.

(b) The Sponsor Affiliate's execution and delivery of this Joinder Agreement, and its compliance with the provisions of this Joinder Agreement, do not result in a default, not waived or cured, under any agreement or instrument to which the Sponsor Affiliate is now a party or by which it is bound.

(c) The execution and delivery of this Joinder Agreement and the availability of the FILOT and other incentives provided by this Joinder Agreement has been instrumental in inducing the Sponsor Affiliate to join with the Sponsor in the Project in the County.

4.     **Request and Consent of Sponsor.**

The Sponsor has requested and consents to the addition of Sponsor Affiliate as Sponsor Affiliate to the Fee Agreement.

5.     **Filings by Sponsor Affiliate.**

Sponsor Affiliate shall timely file each year with the South Carolina Department of Revenue a PT-300 Property Tax Return with completed Schedule S attached (the "Return"), listing the Sponsor Affiliate's Project

4899-8507-2960 v.6

property as Economic Development Property to the extent such Project property qualifies as Economic Development Property.

6.    **Consent of County.**

The County, through approval as authorized in the Fee Agreement, hereby consents to the addition of Silicon Ranch Corporation as Sponsor Affiliate to the Fee Agreement.

7.    **Governing Law.**

This Joinder Agreement is governed by and construed according to the laws, without regard to principles of choice of law, of the State of South Carolina.

8.    **Notice.**

Notices to Sponsor Affiliate under Section 10.1 of the Fee Agreement shall be sent to:

Silicon Ranch Corporation
Attn: Luke Wilkinson
222 Second Ave S. Suite 1900
Nashville, TN 37201

**IN WITNESS WHEREOF**, the undersigned have executed this Joinder Agreement to be effective as of the date set forth below.

SPONSOR AFFILIATE:

Name of Entity:

_____

Signature:_____
Name:_____
Its:_____

IN WITNESS WHEREOF, the County acknowledges it has consented to the addition of the above-named entity as a Sponsor Affiliate under the Fee Agreement effective as of the date set forth above.

**GEORGETOWN COUNTY, SOUTH CAROLINA**

Signature: _____

By: _____

Its:_____

4899-8507-2960 v.6